FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

AUG 3 1 2009  10:30 a.m.

Stephan Harris, Clerk
Casper

Neva Freiermuth, *pro se*
P. O. Box 93
Worland WY 82401-0093
(307) 921-2428



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

NEVA FREIERMUTH                                               )
                                                             )
        Plaintiff,                                           )
                                                             )
vs.                                                          )
                                                             )
THE TOWN OF THERMOPOLIS, an incorporated                     )
    town in the State of Wyoming                             )
THE STATE OF WYOMING,                                        )
BRAD W. BASSE, Chairman HOT SPRINGS                          )
    BOARD OF COUNTY COMMISSIONERS,                           )
THE THERMOPOLIS POLICE DEPARTMENT,                           )   Civil Action No. 09 CV 202-B
THE JOINT LAW ENFORCEMENT CENTER,                            )
LAS FUENTES RESTAURANT, a sole proprietorship,               )
MARK NELSON, individually and in his official                )
    capacity as Thermopolis Chief of Police,                 )
WILLIAM GORDON, individually and in his official             )
    capacity as a law enforcement officer, and as            )   **VERIFIED COMPLAINT**
    an agent of the Town of Thermopolis                      )
JEFF BROWN, individually and in his official                 )   **WITH JURY DEMAND**
    capacity as a Thermopolis police officer,                )
KATHY INMAN, in her official capacity as a 911               )
    dispatcher,                                              )
MICHAEL MESSENGER, individually, and in his                  )
    official capacity as attorney for the Town of            )
    Thermopolis,                                             )
THOMAS HARRINGTON, individually and in his                   )
    official capacity as employee of the Town of             )
    Thermopolis                                              )

LOUIS WALRATH, individually, and in his official )
    capacity as an employee of Hot Springs County )
    and/or the State of Wyoming, )
JOSEPH H. CHRISTMAN, individually, and as a )
    "co-owner" of Las Fuentes Restaurant, )
MELISSA CHRISTMAN, individually, and as a )
    "co-owner" of Las Fuentes Restaurant, )
DEAN WALTZ, individually, as an owner of Las )
    Fuentes Restaurant, and as an owner of 530 )
    Arapahoe Street Thermopolis Wyoming, )
JEANNE WALTZ, as a manager of Las Fuentes )
    Restaurant and an owner of 530 Arapahoe )
    Street, Thermopolis, Wyoming, )
JERRY WILLIAMS, individually, and in his official )
    capacity as county attorney )
And DOES 1 through n, )
                                           )
            Defendants. )

---

## VERIFIED COMPLAINT

COMES NOW the Plaintiff, Neva Freiermuth, *pro se*, and for her causes of action against the Defendants, complains as follows:

### JURISDICTION AND VENUE

1.     This action arises under the Civil Rights Act, 42 U.S. C. §§ 1982, 1983, 1985, 1986, and 1988; the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201-2202; Civil Rights, 28 U.S.C. §1343; the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721 *et. seq.*; the Privacy Act of 1974, 5 U.S.C. §552; the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States; and Article 1, §2 (Equality of All); Article 1, §4 (Security Against Search and Seizure); Article 1, §5 (Imprisonment for Debt); Article 1, §6 (Due Process of Law); Article 1, §7 (No Absolute, Arbitrary Power); Article 1, §8 (Courts Open to All; Suit

Against State); Article 1, §20 (Right of Petition); Article 1, §33 (Compensation for Property Taken); and Article 1, §34 (Uniform Operation of General Law) of the Constitution of the State of Wyoming.

2.    This case is maintained to redress the intentional deprivation – under color of law – of rights, privileges and immunities secured by the Constitution pursuant to 28 U.S.C. §1343, as well as the rights guaranteed by the United States and Wyoming Constitutions and the Laws of the United States and the State of Wyoming.

3.    Plaintiff seeks declaratory and injunctive relief, compensatory, exemplary, and punitive damages, and such other and further relief as may be just and proper in accordance with law and equity, from past, current, and threatened deprivations of Plaintiff's rights under the Constitution and laws of the United States and the State of Wyoming, by the Defendants, acting individually and in concert.

4.    Pursuant to 28 U.S.C § 1367, this Court has jurisdiction over any claims arising under Wyoming Law.  Plaintiff has exhausted the administrative remedies with regard to her claims against governmental entities by serving her Notice of Claim to the appropriate governmental entities pursuant to the Wyoming Governmental Claims Act W.S. §1-39-113.  A copy of Plaintiff's second Notice of Claim, which was mailed by certified mail on July 13, 2009, and was signed by Plaintiff under penalty of perjury, is attached hereto as **Exhibit A** and incorporated herein by reference.  (The State ignored Plaintiff's first Notice of Claim, which was mailed in September 2008.)

5.    Pursuant to 28 U.S.C. § 1391, venue for this case is proper in the United States District Court for the District of Wyoming because the acts and omissions complained of herein occurred within the District of Wyoming and all parties reside in Wyoming.

6.    All claims herein are upon information and belief unless otherwise stated.

3

## PARTIES

7.     Plaintiff is a disabled[1] senior citizen who was, at all times relevant, a resident of
the State of Wyoming.  Plaintiff's physical address at the time these claims arose was 715
Arapahoe Street, Thermopolis WY 82443.  Plaintiff's current address is P. O. Box 93, Worland
WY 82401-0093.

8.     Defendant, The Town of Thermopolis (hereinafter "Town") is an incorporated
town in the State of Wyoming with an address of 420 Broadway, Thermopolis WY 82443.  The
Town of Thermopolis is a governmental entity that derives its power from the State of Wyoming.

9.     Defendant State of Wyoming (hereinafter "State") is a public entity, one of the
United States of America which, through various of its agencies, agents, delegees, and courts,
governs all residents of the State and is responsible for the safety and welfare of all of its
citizens.  The agency responsible for processing claims against the State of Wyoming, is the
Department of Administration and Information, General Services Division, 1920 Thomes Ave.,
Suite 310, Cheyenne WY 82002.

10.     Defendant, Hot Springs Board of County Commissioners (hereinafter "County") is
the governing body for all aspects and operations for Hot Springs County Wyoming.  The
address of Hot Springs Board of County Commissioners is 415 Arapahoe Street, Thermopolis
WY 82443.  Brad Basse is the chairman of the Hot Springs Board of County Commissioners,
and is the proper party pursuant to Wyoming statutes for a plaintiff to assert claims against a
local county government.

11.     Defendant, Thermopolis Police Department, is located at 417 Arapahoe Street,
Thermopolis WY 82443, and is the official entity designated to provide law enforcement
services within the Town.  The Thermopolis Police Department is being sued in its own right and
for the actions of its alleged sub-division, the Thermopolis Animal Control Authority.[2]  Plaintiff
has discovered some documents and public records which suggest that the Hot Springs
Veterinary Clinic is the Animal Control Authority.  However, Defendant Mark Nelson testified

4

under oath that the Thermopolis Police Department is the Animal Control Authority. If he is correct, then the address of the Thermopolis Animal Control Authority is 417 Arapahoe Street, Thermopolis WY 82443.

12.     Defendant, Joint Law Enforcement Center, is a joint venture between the Hot Springs County Sheriff and the Thermopolis Police Department. It is located in a County-owned building at 417 Arapahoe Street, Thermopolis WY 82443, and is operated jointly by the Town and the County. Under agreement and Wyoming law, the Town of Thermopolis and the County of Hot Springs are jointly liable for the acts and omissions of the employees of the Joint Law Enforcement Center.

13.     Defendant, Las Fuentes Restaurant, is a sole proprietorship located at 530 Arapahoe Street, Thermopolis WY 82443. On information and belief, the sole owner is Dean Waltz, a resident of Wyoming.

14.     Defendant, Mark Nelson is the Thermopolis Police Chief, and is a resident of Wyoming. He is being sued individually and in his official capacity as the person in charge of training and supervising police officers in the Town.

15.     Defendant, William (Bill) Gordon, is a resident of Wyoming and is an employee of the Thermopolis Police Department and/or the Joint Law Enforcement Center. His duties include acting as dispatcher, operating the computer, and licensing dogs and cats. He is being sued individually and in his official capacity.

16.     Defendant, Jeff Brown, is a Thermopolis police officer, and is a resident of Wyoming. He is being sued individually and in his official capacity.

17.     Defendant, Kathy Inman, is an employee of the Thermopolis Police Department and/or the Joint Law Enforcement Center, and is a resident of Wyoming. She is being sued in her official capacity.

5

18.     Defendant, Michael Messenger, is the attorney for the Town. His business address is 116 North 5th Street, Thermopolis WY 82443. He is being sued individually and in his official capacity.

19.     Defendant, Thomas Harrington, is a resident of Wyoming, and was at all times relevant an employee of the Town, serving as the municipal judge, was also in private practice, and was sometimes a part-time temporary circuit court magistrate. He is being sued individually and in his official capacity as a former employee of the Town of Thermopolis

20.     Defendant, Louis Walrath, is a resident of Wyoming. He is the current municipal judge for the Town, a part-time temporary magistrate for the Hot Springs County Circuit Court, a part-time temporary magistrate for the Fifth Judicial District Court in Hot Springs County, and is now in private practice as well. He is being sued individually and in his official capacity.

21.     Defendant, Joseph H. Christman, was a resident of Hot Springs County Wyoming at all times relevant. According to statements he made at a court hearing on October 24, 2008, he and his wife are "part-owners" of the sole proprietorship, Las Fuentes Restaurant. He is being sued individually and as "part owner" of Las Fuentes Restaurant.

22.     Defendant, Melissa Christman was a resident of Hot Springs County Wyoming at all times relevant. She is or was the wife of Defendant, Joseph H. Christman. She is being sued individually and as "part owner" of the Las Fuentes Restaurant.

23.     Defendant, Dean Waltz, is a resident of Wyoming, the owner of Las Fuentes Restaurant, and is co-owner of real estate located at 530 Arapahoe that is occupied by Las Fuentes Restaurant. He is being sued individually, as the owner of Las Fuentes Restaurant and as co-owner of 530 Arapahoe Street, Thermopolis WY 82443.

24.     Defendant, Jeanne Waltz, is a resident of Wyoming. She is the wife of Defendant Dean Waltz and is co-owner of real estate located at 530 Arapahoe that is occupied by Las Fuentes Restaurant. She is being sued as an employee or manager of Las Fuentes Restaurant and co-owner of 530 Arapahoe Street, Thermopolis WY 82443.

25.     Defendant, Jerry Williams, business address, 415 Arapahoe Street, Thermopolis WY 82443, is the prosecuting attorney for the County of Hot Springs, Wyoming. He is being sued individually and in his official capacity.

26.     Defendant, DOE Number 1 is the owner of a white pick-up truck, Wyoming license plate #15-4729. This pick-up truck was used by Joseph and/or Melissa Christman to chase, stalk, harass, and assault Plaintiff.

27.     Defendant, DOE Number 2 is the owner of a dark-colored pick-up truck, Wyoming license plate #15-4363. This pick-up truck was used by Joseph and/or Melissa Christman to chase, stalk, harass, and assault Plaintiff.

28.     Defendant DOE Number 3 is the Thermopolis Animal Control Authority, if it is discovered that this entity is not a sub-division of the Thermopolis Police Department.

29.     DOE Number 4 is the man who helped Defendant Joseph Christman assault Plaintiff on October 11, 2008.

30.     DOE's Number 5 – n are persons or entities who conspired with some or all of the above entities to deprive Plaintiff of her constitutional rights.

31.     Plaintiff does not currently know the identities of the "DOE" Defendants, but reserves the right to amend her complaint to amend her Complaint once these entities are identified.

32.     Defendants Mark Nelson, William Gordon, Jeff Brown, Michael Messenger, Thomas Harrington, Louis Walrath, and Jerry Williams are government officials not shielded from liability for civil damages because their conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known.

33.     Judicial immunity does not apply to Defendants Thomas Harrington and Louis Walrath because they acted without authority and their actions were taken in the clear absence of all jurisdiction over the subject matter.[3]

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

34.    On July 24, 2008, Plaintiff was contacted by an employee of the Hot Springs Veterinary Clinic, who requested that she purchase personal property that was otherwise scheduled to be destroyed.  The property had been advertised and unclaimed.  Pursuant to Municipal Code and Animal Control practice, the personal property was scheduled to be destroyed the next day (July 25, 2008) if Plaintiff had not purchased it.

35.    In good faith Plaintiff purchased the personal property from the Town of Thermopolis, through its contract with the Hot Springs Veterinary Clinic, by paying in full $18.00, the usual and customary price for this type of personal property.

36.    Said personal property had been impounded by the Thermopolis Police Department for a tax, assessment or fine pursuant to State statutes and Municipal ordinances.  The previous owner(s), if any, had not paid the fine or impound fees, and had not claimed the property within the statutory time.

37.    The Town subsequently signed full ownership and control of the property to the Hot Springs Veterinary Clinic.

38.    Pursuant to the contract between the Town and the Clinic, the contract was assignable to a third person, both by the terms of the contract and by Thermopolis Municipal Code.

39.    The provisions of the Uniform Commercial Code as adopted in Wyoming (W.S. §34.1-1-101 *et. seq.*) are applicable to the good faith purchase of this type of property.[4]  Pursuant to the UCC, Article 2-403, even a person with voidable title has power to transfer a good title to a good faith purchaser for value.

40.    Both Lorinda Busher, an employee of the Hot Springs Veterinary Clinic, and Laura Inman, the Animal Control Officer for the Town, had assured Plaintiff that her purchase was final, and could not be disputed.

8

41.     On the evening of July 31, 2008, Defendant Melissa Christman, driving a white pick-up truck, license #15-4729, saw Plaintiff walking on the street and began stalking, harassing, and screaming at Plaintiff and falsely claiming that she was the owner of the personal property that Plaintiff had purchased a week earlier.

42.     After following and shrieking at Plaintiff for several minutes, Defendant Melissa Christman called Defendant Joseph Christman on her cell phone. She also called a known drug abuser, Michael Grissom. Defendant Joseph Christman arrived on the scene driving a black or dark-colored pick-up truck, license # 15-4363. He jumped out of the truck, assaulted Plaintiff, bruised her arms, prevented her from traveling in any direction, and attempted to rob her.

43.     Shortly afterward, Officer Jeff Brown arrived on the scene in his police car.

44.     Defendant Brown told the Christmans to leave Plaintiff alone. Then he gave Plaintiff a ride home. He gave Plaintiff the names and address of the Christmans, and stated that Joe Christman owned the Red Cliffs Steak and Seafood Restaurant by the airport.

45.     As a result of this stressful situation, Plaintiff suffered a tachycardia event (an irregular heartbeat) and had difficulty getting her heart to beat normally again.

46.     The following day, August 1, 2008, Plaintiff called Defendant William Gordon and asked about getting a copy of the police report. Defendant Gordon refused and instead told Plaintiff that Defendant Police Chief Mark Nelson wanted to talk to her. Defendant Nelson demanded that Plaintiff give the personal property to the Christmans. When she refused, Defendant Nelson said that he had talked to Defendant Michael Messenger and that Defendant Messenger was going to file a lawsuit against Plaintiff and on behalf of Defendants Joseph and Melissa Christman to obtain return of the personal property that plaintiff had recently purchased. Defendant Nelson claimed that the Town would win the lawsuit because it would be filed in Municipal Court, and the Municipal Court Judge (Defendant Thomas Harrington) would have to rule in favor of the Town. Defendant Nelson said he would give Plaintiff a copy of the police

report if she put her request in writing, but when Plaintiff complied, he refused to provide any reports.

47.    The next day Rene Sorensen, an employee of Michael Messenger, acting on instructions from Michael Messenger, contacted Plaintiff to try to coerce her to give up the personal property that the Christmans had tried to steal. She said that her "boss" was going to file a lawsuit against Plaintiff in municipal court, which Mrs. Sorensen said would "go very badly" for Plaintiff. She said that her "boss" was the town attorney, responsible for prosecuting people and he could make a lot of trouble for Plaintiff.

48.    It is immoral to give bullies something you own, just because they try to steal it. That is why those Somallian pirates keep kidnapping sailors. If the ship owners had refused to pay ransom when the very first Somallian pirates took a ship, there wouldn't be a problem now.

49.    Plaintiff tried to find out how many other people in town might have had similar experiences with the defendants, so she tried to get copies of court records and police records, but both the police and the clerks of the courts refused to allow Plaintiff to examine public records.

50.    Over the next few weeks, Defendants Joseph and Melissa Christman continued to stalk, harass, and threaten Plaintiff on numerous occasions.

51.    Plaintiff tried to file a suit for a restraining order against the Christmans in Circuit Court in order to avoid the municipal court and its judge, Thomas Harrington, who Plaintiff had been told had conspired to rule against Plaintiff. However, the Circuit Court Clerk told Plaintiff that she could not file for a restraining order *pro se*, but that she must hire an attorney.

52.    The police department also refused to provide copies of police reports to plaintiff's attorney, Albert Sinn, who filed an action in Circuit Court to avoid Defendant Harrington

53.    The Defendants, Joe and Melissa Christman, did not file an Answer or Motion for Summary Judgment. They appeared at the hearing *pro se*.

54.     Upon arriving at the hearing on August 15, 2008, Plaintiff discovered that the magistrate was Thomas Harrington, who had insinuated himself into the case without authority (i.e. without being appointed by a Circuit Court Judge pursuant to W.S. §5-9-212).

55.     Although the Christmans had admitted waylaying Plaintiff and refusing to let her walk on the public sidewalk unmolested, Defendant Harrington said "Neither of these people have done anything wrong." He refused to grant a restraining order and ordered a trial for September 5, 2008 to determine the ownership of the personal property. He tried to order Plaintiff to give "visitation rights" to the Christmans, but Plaintiff's attorney informed him that there is no such thing as visitation with personal property.

56.     In order for the defendants to prevail on their claim of ownership, they would have had to Join the Town as a party, so, as an employee of the Town, Defendant Harrington should have recused himself.

57.     Plaintiff's attorney tried to get Defendant Harrington to recuse himself, but he refused. Since he was just a part-time temporary magistrate and not a full-fledged Circuit Court Judge, pursuant to W.S. §5-9-212(b) he could not hear the case without the consent of all parties.

58.     But Defendant Harrington insisted on presiding over the trial, in spite of Wyoming statutes and in spite of his bias and conflict of interest.

59.     Approximately the third week of August Plaintiff instructed her attorney to dismiss the case, which she had an absolute right to do under Rule 41(a)(1)(i) since the defendants had not filed an Answer or Motion for Summary Judgment.

60.     Before dawn on September 1, 2008, while walking her dog on a deserted street, Plaintiff noticed the dark-colored pick-up truck, license #15-4363, that Defendant Joseph Christman had been driving on previous occasions when he had been stalking and harassing Plaintiff. The pick-up truck passed Plaintiff on the deserted street and stopped about 10-15 feet in front of her.

11

61.     Plaintiff believed that Defendant Christman was waiting for Plaintiff to come abreast of the truck and that he might then jump out and attack her, so she immediately turned and ran the other way. The pick-up truck turned and followed. Plaintiff ran through back yards and alleys, in an attempt to evade capture – the dog leading the way. Then Plaintiff called 911. The dispatcher identified himself as Bill Gordon. Defendant Gordon would not dispatch an officer to come to Plaintiff's aid, even when she told him she thought she was having heart attack.

62.     After arriving home, Plaintiff called Defendant Gordon on the police non-emergency line and told him she had arrived home safely. About 1 ¾ hours later a police officer finally responded to Plaintiff's 911 call, but by that time, Plaintiff's heart had started beating normally again.

63.     On September 2, 2008, because of the threats by Town employees and because the police and the courts refused to provide police protection or copies of public records (including the police reports of the physical attacks on Plaintiff), Plaintiff exercised her First Amendment right to petition the government for a redress of grievances and filed a claim against the Town, threatening to sue and asking that Defendant Gordon be removed from dispatching duties.

64.     Although the Thermopolis police department refused to provide Plaintiff with copies of the police reports or copies of the 911 calls, they gave these reports to Defendant Christman. (On December 10, 2008, Defendant Nelson admitted under oath that he had refused to provide copies of the police reports to Plaintiff in retaliation for the grievance Plaintiff had filed with the Town. Also on December 10, 2008, when Defendants introduced some of these reports into evidence at trial – over Plaintiff's objection – Plaintiff discovered that Defendant Gordon did not dispatch an officer to assist Plaintiff until five minutes after she told him she had arrived home safely. That report stated that Defendant Gordon had dispatched an officer to look for a white truck, license plate # 15-4729, to a location about a mile from the location Plaintiff had given him. **Defendant Gordon waited until the emergency had passed, then deliberately dispatched an officer to the <u>wrong location</u> to look for the <u>wrong vehicle!</u>)**[5] What is worse, the police reports Defendants gave Defendant Christman contained all of Plaintiff's personal

information including her full name, date of birth, address, telephone number, and Social Security Number.

65.    The police department could only have obtained this information from the Wyoming Department of Motor Vehicles, who, in turn could only have obtained this information from Plaintiff's driver's license application.

66.    The State Motor Vehicle Department is routinely supplying personal information of all drivers to all police departments in the state – in violation of the Privacy Act of 1974 and the Driver's Privacy Protection Act.  Then the Thermopolis Police Department is routinely including this personal information in all police reports and failing to redact this personal information even when the information is the victim's personal information and is being given to the perpetrator.

67.    Violation of 18 U.S.C. § 2721 is a criminal act, carrying criminal penalties.  Under the Act, Plaintiff is entitled to a minimum of $2,500.00 liquidated damages plus attorney's fees and costs.  Or Plaintiff can ask for actual damages, which are incalculable.  Because Defendants have his information, they can find Plaintiff wherever she tries to hide.  Even if the defendants discontinue stalking her, Plaintiff will NEVER feel safe.

68.    On or about September 1, 2008, Plaintiff again contacted Defendant Nelson and again asked for copies of all police reports and 911 tapes.  Defendant Nelson refused.  Plaintiff asked Defendant Nelson what weapons she could legally carry with her if she had to leave her house, since the police refused to provide her with police protection.  Defendant Nelson advised Plaintiff that she could legally carry almost any weapon.  He said she could carry a knife, a stun gun, pepper spray, mace, etc.  He told Plaintiff that she could even carry a loaded firearm as long as it was not concealed.

69.    On September 1, 2008, after again being stalked and chased and after again being refused a copy of the police report, Plaintiff again contacted Mr. Sinn to find out if he had dismissed the case.  He had not.  There was absolutely no point in continuing to ask for a

restraining order since Defendant Harrington refused to recuse himself and because it had become obvious that the police would not enforce a restraining order even if one was obtained.

70.    Furthermore, Plaintiff had discovered that Defendant Harrington and Plaintiff's attorney, Albert Sinn, were co-defendants in a federal civil rights case (8CV114B, filed April 30, 2008, in U.S. District Court), which was a conflict of interest.

71.    So Plaintiff again insisted that her attorney dismiss the case, which he did on September 2, 2008, depriving the Court of all jurisdiction.

"On this issue, we have held that once a Rule 41(a)(1) dismissal has been filed, "the district court loses jurisdiction over the dismissed claims and may not address the merits of such claims or issue further orders pertaining to them." *Netwig v.Georgia-Pacific Corporation*, 375 F.3d 1009, (10th Cir. 2004.) (See additional case law in Endnotes.)[6] [7]

72.    But Defendant Harrington refused to allow the dismissal. Acting without authority and without any jurisdiction at all, he scheduled a trial for September 26, 2008.

73.    When a magistrate has a personal interest in a case, such as when his employer is a necessary third party, he must recuse or disqualify himself. The fact that he refused to recuse himself and continued to keep the case open in spite of Plaintiff's dismissal was either the act of retaliation under color of law against Plaintiff for attempting to enforce her Civil and Constitutional Rights, or an unfair act of extreme, unreasonable, discriminatory bias.

74.    It was not until after Plaintiff filed complaints against him, including the complaint to the Town, and letters to the Judicial Nominating Committee and Governor Freudenthal, that Defendant Harrington finally recused himself and appointed Defendant Louis Walrath to take his place.

75.    Since Defendant Harrington was not at that time a Circuit Court Judge, he had no authority to appoint another magistrate to take his place. (W.S. §5-9-212)

76.    It was not until Defendant Walrath dismissed the case and vacated the trial date that Plaintiff had knowledge that there was a trial scheduled. Plaintiff received two copies of Defendant Walrath's dismissal -- one on September 26, 2008 and one on September 29, 2008.

77.    Because she was denied police protection, even in a medical emergency, Plaintiff began looking for another place to live outside of Hot Springs County and kept her doors double locked. She purchased some pepper spray from Canyon Sporting Goods. Plaintiff also went online and purchased a stun gun. When the stun gun arrived, Plaintiff put the pepper spray in her coat pocket and carried the stun gun in her hand whenever she left the house.

78.    Defendants continued stalking and harassing Plaintiff. Plaintiff received multiple hang-up phone calls; she was chased by Melissa Christman who was driving the white pick-up truck license #15-4729; she was followed by Michael Grissom; and she was nearly run over by someone driving the white pick-up truck license #15-4729. This last incident caused Plaintiff to fall and chip a tooth, necessitating two trips to the dentist.

79.    Plaintiff became a prisoner in her own home – afraid to leave her house. When she did leave, she went by car even for short errands and did her shopping in neighboring towns, afraid of running into Defendants Joseph and Melissa Christman.

80.    After a snowstorm on October 11, 2008, Plaintiff didn't want to drive in the snow and so took a chance and decided to walk to the post office, three blocks from her house and right past the Law Enforcement Center.

81.    On her way to the post office, there was no sign of the pick-up trucks that the Christmans regularly drove. Plaintiff had been ever vigilant in watching for them.

82.    But someone in the Las Fuentes Restaurant saw Plaintiff walk by, correctly guessed that she would come back the same way, and called Defendant Joseph Christman to advise him that Plaintiff had been seen in the neighborhood.

83.    When Plaintiff walked back toward home, she saw a white pick-up truck parked behind another vehicle in such a manner that it couldn't be seen until Plaintiff was in front of Las

15

Fuentes. Plaintiff immediately tried to turn and go the other way, but Defendant Joseph

Christman jumped out from behind the front door of Las Fuentes where he had been hiding and

attempted to rob and assault Plaintiff.

84.    Plaintiff yelled at Defendant Christman to stay away, held out her stun gun and

pulled the trigger, causing it to make a "zzzzt" sound, but Defendant Christman just kept coming.

He ran right into the stun gun, and briefly touched the end of the stun gun with a sweater that

was pouched out over his stomach. He was repelled, and since Plaintiff was backing away at the

time, the contact was only for a fraction of a second – not enough to stun him. Defendant

Christman and DOE Number 4 surrounded Plaintiff and tried to rob her. The two men would not

let Plaintiff leave; and so she pulled the pepper spray out of her pocket and sprayed a mist

between her and Defendant Christman. When the defendants backed away, Plaintiff was able to

retrieve the bank statement that Defendant Christman had grabbed out of her hand, but that had

dropped onto the snow when he came into contact with the stun gun. Then Plaintiff started to

run home.

85.    Then Defendant Dean Waltz, who had been hiding behind the building, came

around the corner in his vehicle and began yelling at Plaintiff. Plaintiff kept running, and

Defendant Waltz kept gunning his engine and acting as though he would run over Plaintiff.

Plaintiff continued running toward home, all the time Defendant Waltz followed and kept

threatening her and gunning his engine.

86.    When Plaintiff arrived home, she dialed 911. Defendant Gordon answered. He

was very rude and let Plaintiff know how angry he was that Plaintiff had asked for his removal as

police dispatcher. He told Plaintiff that an officer was on his way to Plaintiff's house arrest her –

not the men who had assaulted her.

87.    Then Officer Brown arrived at Plaintiff's home. He said, "You shouldn't have

dismissed that restraining order!" He demanded to see the "taser" and when Plaintiff responded,

"What taser?" he wrote in his report that Plaintiff had lied about having a stun gun. Then he

searched Plaintiff's house and confiscated the pepper spray and the stun gun without a search

16

warrant. He refused to examine the envelope that Defendant Christman had taken away from Plaintiff or have it tested for DNA and/or fingerprints. Once again, he refused to arrest any of the men who had attacked Plaintiff, but instead issued a citation to Plaintiff for assault and battery, even though he KNEW that Plaintiff was the victim. Defendant Brown knew that the odds against Plaintiff were 3 to 1. He knew (because Defendant Christman told him) that Plaintiff had warned Defendant Christman to stay away. Defendant Brown had been a witness to one of the previous attacks on Plaintiff; he knew that Plaintiff had filed for a restraining order; he knew that Defendant Christman was a member of the drug culture; he knew that Christman had a record of being arrested by Thermopolis police; he knew that he had been called to the Christman home because of domestic violence calls; he knew that Plaintiff was twice Defendant Christman's age, and much smaller; he knew that Plaintiff could not recognize anyone because of her prosopagnosia, so she could not have been the aggressor; he knew that Plaintiff would have had no motive to assault Christman and that she never would have known who he was if he hadn't kept attacking her; he and the rest of the police department knew how afraid Plaintiff was of Defendant Christman and about the frantic 911 calls Plaintiff had made; he knew Plaintiff was not strong enough to defend herself; he knew that Defendant Christman had changed his story after flaws were discovered in his original story; he knew that the "witness," Defendant Dean Waltz, was a relative of Defendant Christman. Defendant Brown didn't include any of these things in his police report even though he knew County Attorney Jerry Williams would rely on the police report in deciding whether or not to prosecute.

88.    Defendant Gordon conspired with the other defendants to have Plaintiff charged with a crime in retaliation for the complaint she filed against him, and in a wrongful attempt to obtain the personal property that Defendants had been trying to steal. The Defendants acted in concert in retaliation for the grievance that Plaintiff had filed.

89.    Plaintiff sold her house, gave away the personal property[8] that had been in dispute, and moved out of town. In doing so, Plaintiff suffered a substantial loss on the sale of her home, lost the rental income from the little house out back, and lost income from her part-time job.

90. In spite of multiple requests for Discovery and for a speedy trial, County Attorney Jerry Williams refused to provide any meaningful discovery and eventually dismissed the false charges against Plaintiff. A dismissal was signed on February 29, 2009, by an unknown judge or magistrate (signature illegible and no printed name.)

91. In the meantime, on or about October 28, 2008, Defendants Joseph and Melissa Christman filed motions to reopen the restraining order case that Plaintiff had dismissed. They filed a Counterclaim in Replevin.

92. Plaintiff sought and obtained permission to appear pro se, and in her responsive pleadings, Plaintiff alleged among other things that:

- the case was closed pursuant to Rule 41 W.R.C.P.,
- Defendants had no standing to sue pursuant to W.S. §11-31-211,[9]
- the sale of the personal property to Plaintiff was final pursuant to UCC 2-403,
- she no longer owned or possessed the personal property Defendants wanted to replevy,
- Defendants could not prove <u>any</u> of the elements necessary for Replevin,
- Defendants came to the court with unclean hands,
- not all necessary parties were joined,
- the time for filing an Answer had long since expired,[10] and
- Defendants didn't request leave of Court to file an Answer and Counterclaim.

93. Magistrate Walrath said he would listen to the tape of the August 15, 2008, hearing and issue his ruling.

94. A few days later, Defendant Walrath ruled that the Defendants could reopen the case. During a hearing sometime later, he admitted that he never bothered to listen to the tape.

95. On November 20, 2008, Plaintiff filed a Motion for Summary Judgment.

96. Later, during a telephone hearing, Defendant Walrath refused to delay a trial he had set for December 3, 2008, saying, "These people have been without their dog long enough."

97.    Plaintiff promptly filed a Demand for a Jury Trial.

98.    Defendant rescheduled the trial for December 10, 2008, and ordered the parties to file their proposed jury instructions by December 5, 2008.  Plaintiff complied with this order, but Defendants did not.  Their attorney, Jeff Stanbury, mailed Plaintiff's copy of their proposed jury instructions too late for Plaintiff to receive them before the trial.

99.    Plaintiff asked Defendant Walrath if the new circuit court judge (Defendant Harrington) was his supervisor, and could fire him.  Defendant Walrath admitted that that was true.

100.    Plaintiff was sure that Defendant Walrath was just as biased against her as Defendant Harrington was – perhaps more so, since Defendant Walrath wanted the Town to appoint him to be the new municipal court judge.  However, Defendant Walrath refused to recuse himself.

101.    At a hearing on December 3, 2008, Defendant Walrath ordered Plaintiff to bring the personal property that she no longer owned or possessed to the sheriff before trial, "so that the dog could immediately be given to whichever party won the case."

102.    On December 4, 2008, Plaintiff filed a Motion for Reconsideration, stating that the Order was void, that Plaintiff did not have the address of the new owner, that the new owner would not agree to surrender his property, and that the Order instructed Plaintiff to go to Colorado and steal the personal property from its new owner and transport said stolen property across state lines.  Defendant Walrath had no authority to hold a trial pursuant to W.S. §5-9-212(b); he had no jurisdiction pursuant to Rule 41(a)(1)(i) W.R.C.P.; and he certainly had no authority to order Plaintiff to recover property owned by another person, particularly someone whose property rights were protected by the laws of another state.

103.    Defendant Walrath never ruled on Plaintiff's Motion for Reconsideration.

104.    On December 6, 2008, Plaintiff received information that Defendant Walrath had conspired with the Town and the Christmans to direct the jury verdict in favor of the Christmans.

19

105. On December 6, 2008, Plaintiff filed a Motion for Change of Venue in which she disclosed the information she had received that there would be a directed verdict.

106. In a letter postmarked December 8, 2008, Defendant denied Plaintiff's request for Change of Venue and denied Plaintiff's Motion for Summary Judgment. He also demanded the impossible – that Plaintiff travel to Colorado and have the personal property in the courtroom by the beginning of the trial on December 10, 2008.

107. Before the trial, Dean and Jeanne Waltz sat in the courtroom and made sure all the jurors knew that they knew who the jurors were. They didn't testify, but left as soon as the jury was selected. Dean and Jeanne Waltz are known drug abusers; Dean Waltz has a reputation of being the meanest man in the State, and everyone is afraid of him.

108. Plaintiff had no opportunity to prepare for trial and no time to subpoena witnesses. Some witnesses were out of town and some had been threatened and intimidated out of testifying.

109. So Plaintiff called only two witnesses besides herself: (1) the Animal Control Officer, Laura Inman, who disputed the defendants' claim that they had reported their missing property to her, and (2) Marge Worster, a senior citizen who, in the dark, bears a slight resemblance to Plaintiff and who testified that, while walking her Border Collie, she had been frightened and harassed by a man in his 30's with a beard, driving a white pick-up truck who screamed obscenities at her. (Because it had been dark, Mrs. Worster could not positively identify him, but she testified that she had seen the same truck a few days later, parked near the Christman's residence.) Thermopolis is a small town. It is unlikely there are two crazed men in their 30's with beards, driving white pick-up trucks and threatening and harassing little old ladies walking Border Collies.

110. Plaintiff is unsure what happened during the rest of the trial because during her testimony, while leaving the witness stand to retrieve a forgotten exhibit, Plaintiff fell.[11] The fall caused an episode of Supra Ventricular Tachycardia, which Plaintiff did not immediately

20

recognize as such, probably because she was so pumped up with adrenalin. However, Plaintiff had warned the jury and Defendant Walrath about her condition before the trial, and asked everyone to let her know if her face appeared very pale. (Supra Ventricular Tachycardia causes a heartbeat of approximately 240 beats per minute. At that rate, the heart can't fill up with blood between beats, and the brain – and the face – don't get enough oxygen.) However, no one warned Plaintiff. Even when Plaintiff complained of feeling ill and being very cold, Defendant Walrath didn't inform her that her face was <u>very</u> pale, but just said, "You may put your coat on."

111.   Most of Plaintiff's testimony was disallowed by Magistrate Walrath. He wouldn't allow any testimony about the October 11, 2008, assault on Plaintiff; he wouldn't allow any testimony or proof that the defendants never owned the property they sought to replevy.

112.   The Defendants called three police officers who all testified that the police department was negligent. They didn't hear each other testify, but they all used the exact same words, "Something fell through the cracks." The Defendants had consistently alleged that they had called Laura Inman, the Animal Control Officer, to report their dog missing. After Laura Inman testified they hadn't called her, Laura Inman's mother, Kathy Inman, testified that she was the "Inman" on the police report, and that she didn't know why she didn't discover that a similar dog had been picked up by Defendant Brown three days earlier.[12] There were several discrepancies in her story; part of her testimony was later contradicted by Defendant Brown; and in addition, Laura Inman had told Plaintiff the night before that her mother (Kathy Inman) had called her to warn her that Police Chief Mark Nelson (Defendant Nelson) was going to call her (to influence her testimony.) Defendants Kathy Inman, Mark Nelson, and Jeff Brown all lied on the witness stand. Defendant Joseph Christman testified that he had never licensed his dog and so, pursuant to W.S. §11-31-211, he never owned it, but Defendant Walrath refused to dismiss the case when Plaintiff so moved immediately after that admission.

113.   Plaintiff had provided Replevin jury instructions, but Defendant Walrath refused to use them.

21

114.    Plaintiff didn't see Defendants' proposed jury instructions until after the trial, but Defendant Walrath used them anyway, over Plaintiff's objections.  They were not Replevin instructions and did not present the law set forth in W.S §1-15-102.  There were multiple confusing and conflicting instructions; each one was a way in which the jury "must" find for the defendants.  For example, one instruction said that if Plaintiff hadn't proved that the defendants never owned the dog that was the subject of the dispute, the jury must find for the defendants.  Another instruction said that if the jury found that the police were negligent, they must find for the defendants, (even though the police department was not a party.)  There was one "Replevin" instruction, but instead of informing the jury that the burden of proof was on the party seeking Replevin, and listing each of the things that a party seeking Replevin must prove, the jury was instructed that the Plaintiff (Counterclaim Defendant) must prove the <u>opposite</u> of each item on the list.  Even more ridiculous, one of the items that the Plaintiff must prove, was that "<u>Plaintiff</u> impounded the dog for a fine, assessment or tax."

115.    So Defendant Walrath acting <u>without</u> authority and <u>without</u> jurisdiction, and over the specific objection of the Plaintiff, conducted a trial during which he refused to allow Plaintiff to prove that the defendants never owned the dog, and then instructed the jury that if the plaintiff didn't prove the defendants never owned the dog, they must find for the defendants.  He never defined Replevin to the jury, ignored Plaintiff's affirmative defenses (most of which were admitted by the defendants) and insisted on allowing exhibits into evidence (and thus into Public Record) that contained Plaintiff's protected personal information.

116.    After a few hours, the jury returned the expected verdict.

117.    Almost immediately thereafter, the Town hired Defendant Walrath to be its new municipal judge.

118.    There was supposed to be a contempt hearing after which Plaintiff would be jailed until she produced the property that the defendants had "won" at trial (a <u>life</u> sentence for Plaintiff and a death sentence for Plaintiff's diabetic cat, which requires twice-daily insulin injections.)

This scheduled hearing caused Plaintiff severe emotional distress. The hearing was postponed repeatedly, causing additional emotional distress and financial expenditures.

119.   Finally, after realizing that Plaintiff could not be intimidated into producing property that she no longer possessed, Defendant Walrath sent Plaintiff a letter in which he admitted that he was appointed to the case, not by a Circuit Court Judge, as required, but by part-time-temporary magistrate Thomas Harrington. Defendant Walrath finally recused himself, and on February 26, 2009, Circuit Court Judge Waters, vacated the jury verdict on grounds that Defendant Walrath was not authorized to conduct a trial pursuant to W.S. §5-9-212(b). He signed the Order for a new trial on March 19, 2009. Plaintiff's attorney never got to address the point of law that the case had already been dismissed, because Judge Waters had already made up his mind that the case needed to be dismissed. In fact, he had been on the verge of dismissing the case, discussing the reasons at length, when Joseph Christman interrupted and started arguing with him. Judge Waters threatened to jail him for contempt, so Melissa Christman stormed out of the courtroom and Joseph Christman followed, shouting to Judge Waters that, *You're the scum of the earth,"* as he reached the door of the courtroom. For some reason, after being threatened and defamed, Judge Waters then decided to order a new trial instead of dismissing the case altogether.

120.   On April 17, 2009, Defendants Joseph and Melissa Christman appealed the Order, but District Court Judge Skar dismissed their appeal.

### FIRST CLAIM FOR RELIEF

VIOLATION OF THE DRIVER'S PRIVACY PROTECTION ACT
18 U.S.C. § 2721 *et. seq.*

Against the State of Wyoming, the Town of Thermopolis, Hot Springs
County, the Thermopolis Police Department, the Joint Law Enforcement
Center, Mark Nelson, Jerry Williams and Louis Walrath

121.   Plaintiff realleges all preceding paragraphs as though fully set forth herein.

122.    The Defendants, individually, and in concert with each other have continuously, arbitrarily, and capriciously violated the Plaintiff's rights under 18 U.S.C. § 2721 *et. seq.* also known as the Driver's Privacy Protection Act. (Hereinafter "DPPA.")

123.    State DMVs require drivers and automobile owners to provide personal information, which may include a person's name, address, telephone number, vehicle description, Social Security number, medical information, and photograph as a condition of obtaining a driver's license or registering an automobile.

124.    The DPPA regulates the disclosure and resale of personal information contained in the records of state DMVs.

125.    With certain narrowly defined exceptions (which do not apply here) the DPPA prohibits any State DMV, or officer, employee, or contractor thereof, from knowingly disclosing or otherwise making available to any person or entity personal information about any individual obtained by the department in connection with a motor vehicle record.  18 U.S.C. § 2721.

126.    This protected personal information includes an individual's name, address, Social Security number, and telephone number.  18 U.S.C. § 2725

127.    The DPPA's provisions do not apply solely to States.  The Act also regulates the redisclosure of drivers' personal information by persons who have obtained that information from a State DMV.  18 U.S.C. § 2721(c).

128.    Any person who knowingly obtains, discloses, or uses information from a State motor vehicle record for a use other than those specifically permitted by the DPPA is subject to liability in a civil action brought by the driver to whom the information pertains, 18 U.S.C. § 2724 and may be subject to a criminal fine, 18 U.S.C. § 2723.

129.    Under an amendment to the DPPA, there is an "opt in" requirement if any State wishes consent to disclose some of the drivers' personal information (but NOT the Social Security number) for use in surveys, marketing, solicitations, and other restricted purposes. Public Law 106-69, 113 Stat. 986, which was signed into law on October 9, 1999.

130.   Plaintiff did not "opt in" when she applied for her Wyoming Driver's License.  In fact, Plaintiff had a reasonable expectation of privacy with respect to her personal information. The information collected by a state agency for the purpose of issuing drivers licenses is gathered for the specific purpose of protection of public safety and the administration of state roadways.  This information should be used only for licensing-related uses.  It is consistent with the licensee's expectation of privacy that information that is collected for a particular purpose will be used only for that purpose.

131.   The State should not impermissibly burden the right to travel by first compelling the collection of sensitive personal information and then subsequently disclose the same information for unrelated purposes.

132.   If an individual has not given consent to the release of a motor vehicle record, the DPPA limits sharing of information once it is obtained.  Information may only be shared with other approved users and only for permitted uses.

133.   Sharing of a victim's personal information with her alleged perpetrator is not a permitted use.

134.   But when Plaintiff reported to police that she had been stalked, chased, and assaulted by Joseph and Melissa Christman, the Defendants gave Joseph and/or Melissa Christman copies of the police reports that contained this personal information.

135.   Then Defendant Walrath allowed this protected personal information to be placed in Case No. CV 2008-106, which is Public Record.

136.   Defendant Williams obtained this same protected information from the State DMV and allowed this protected personal information to be placed in Case No. CT 2008-1391, which is Public Record, and has refused to redact this personal information or allow the case to be sealed.

137.   The DPPA requires the State's employees to learn and apply the Act's substantive restrictions.[13]

25

138.   It is a regular practice of the State to supply sensitive personal information to other agencies in violation of the Privacy Act of 1974, 5 U.S.C. § 552.  The State makes no effort to train its employees about the DPPA or other privacy laws and the State makes no effort to instruct the agencies to which it supplies the personal information of its citizens about the DPPA or other privacy laws.

139.   It is a regular practice of the Town of Thermopolis, County of Hot Springs, Thermopolis Police Department, and the Joint Law Enforcement Center, to supply sensitive personal information obtained from the DMV when they supply police reports to citizens.

140.   Defendant Joseph Christman submitted a police report of his alleged report of a missing dog into evidence at a court hearing.  The police report contained all of Defendant Christman's protected personal information.

141.   As a result of this disclosure, Plaintiff was able to discover that two separate individuals are using the same name, date of birth, and Social Security number.  One Joseph H. Christman was living in Alaska until 2006, and then moved to Wyoming.  The other Joseph Hayden Christman was living in Florida until he moved to Colorado in 2007.

142.   The DPPA has been upheld by the 11th Circuit Court of Appeals, *Collier v. Dickinson*, 2007 WL 437370 (11th Cir. Feb. 12, 2007), and the United States Supreme Court, *Reno v. Condon*, 528 U.S. 141 (2000).

143.   The DPPA is not the only law that protects the privacy of an individual.  The Privacy Act of 1974, 5 U.S.C. §552(a); the Gramm-Leach-Bliley Act, 15 U.S.C. §6801; the Federal Trade Commission; certain provisions of the Telecommunications Act and Postal Regulations; *Roe v. Wade*; the Fourteenth Amendment to the United States Constitution; W.S. §16-4-201 *et. seq*., and W.S. §6-3-901 also protect the privacy rights to an individual with respect to his personal information.

144.   In *Roe v. Wade*, the Supreme Court recognized two types of privacy.  The second type of privacy right is an individual's right to be free of disclosure of personal information.

145.   The potential harm to an individual is not just the possible misuse of a person's good credit by an identity thief, but this harm can also include the possible arrest of a person for a crime committed by the person who stole his identity.

146.   Or a person can be harmed if an identity thief uses a victim's identity to obtain medical care.  This could cause the victim to be treated for the wrong medical condition.

147.   Because of the importance placed on privacy in the Social security program, the very first regulation adopted by the new Social Security board in June 1937 was its rules regarding confidentiality of its records.  (Social Security Administration, *Regulation No. 1*, adopted July 15, 1937.)

148.   The DPPA was originally passed in reaction to the 1989 death of actress Rebecca Schaeffer.  An obsessed "fan" was able to obtain her address through California motor vehicle records.  The "fan" then used this information to kill her.

149.   The Defendants have engaged in a policy or practice of substantial noncompliance with the DPPA as well as substantial noncompliance with the other statutes listed above.

150.   Plaintiff has been damaged by the Defendants' substantial noncompliance of the DPPA and their substantial noncompliance with the other Acts referenced above.

151.   As a result of this noncompliance, Plaintiff suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, humiliation, worry and fear, medical expenses, legal expenses, moving costs, loss of income, loss of reputation, loss of enjoyment of life, and other losses, both tangible and intangible.

152.   Plaintiff is entitled to full, just and reasonable compensation for all of her damages, including actual damages and compensatory damages, both tangible and intangible, and for costs, attorney fees and such other relief as may be awarded by the Court.

153.   Plaintiff reserves the right to add additional defendants to this claim, after further information is discovered.

27

## SECOND CLAIM FOR RELIEF

VIOLATION OF CIVIL RIGHTS – FOURTEENTH AMENDMENT
Against the Town of Thermopolis, the County of Hot Springs, the Joint Law
Enforcement Center, the Thermopolis Police Department, Michael Messenger,
Mark Nelson, William Gordon, Joseph Christman, Melissa Christman, Dean
Waltz, Thomas Harrington, Louis Walrath, and DOEs Number 1 and 2.

154.   Plaintiff realleges all preceding paragraphs as though fully set forth herein.

155.   The Town, the County, the Thermopolis Police Department, the Joint Law
Enforcement Center and the employees of these entities have a practice and pattern of treating
some citizens differently than others by giving preference in all things to the Town "elite"

156.   The Defendants, individually, and in concert with each other have continuously,
arbitrarily, and capriciously violated and conspired to violate the Plaintiff's rights as guaranteed
by the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United
States, and Article 1, §§2, 6, 7, 8, 21, and 34 of the Constitution of the State of Wyoming, by
interfering with Plaintiff's right to equal protection of the law, equal enjoyment of life, equal
treatment by Town and County officials, equal treatment in the Courts, equal right to inspect
Public Records, equal right to walk down the public streets unmolested, equal right to freedom
from harassment, threats, and abuse of process, equal right to privacy, and equal right to contract
with the Town and its agents for the purchase of an unlicensed, abandoned dog.[14]

157.   The Defendants were acting "under color" of the authority of the State.

158.   The Defendants acts were the proximate or legal cause of damages sustained by the
Plaintiff.

159.   Except for such conduct, the damages to Plaintiff would not have occurred.

160.   As a result of this conduct, Plaintiff suffered and continues to suffer emotional
pain, suffering, inconvenience, mental anguish, humiliation, medical expenses, legal expenses,
moving costs, loss of income, loss of reputation, loss of enjoyment of life, and other losses, both
tangible and intangible.

161.  Plaintiff is entitled to full, just and reasonable compensation for all of her damages, including actual damages and compensatory damages, both tangible and intangible, and for costs, attorney fees and such other relief as may be awarded by the Court.

## THIRD CLAIM FOR RELIEF

VIOLATION OF CIVIL RIGHTS – FIRST AMENDMENT
Against the Town of Thermopolis, County of Hot Springs, the Thermopolis
Police Department, Michael Messenger, Thomas Harrington, Louis Walrath,
Mark Nelson, William Gordon, the Law Enforcement Center, and DOEs 5 - n

162.  Plaintiff realleges all preceding paragraphs as though fully set forth herein.

163.  The Defendants, individually, and in concert with each other have continuously, arbitrarily, and capriciously violated the Plaintiff's rights as guaranteed by the Freedom of Speech/Right to Petition Clause of the First Amendment to the Constitution of the United States, and Article 1. §§20 and 21 of the Constitution of the State of Wyoming.

164.  On September 2, 2008, Plaintiff asserted her constitutional right to file a grievance with the Town of Thermopolis, the Thermopolis Police Department, Defendant Gordon and Defendant Harrington.

165.  That grievance was a substantial or motivating factor in the Defendants' decision to deny Plaintiff the same rights and privileges that were given freely to other citizens, including police protection and access to public records such as police reports and court records.

166.  That grievance was a substantial or motivating factor in the Defendants' decision to charge Plaintiff with a crime.

167.  The actions of the Defendants were "under color" of the authority of the State.

168.  As a result of this conduct, Plaintiff suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, humiliation, medical expenses, legal expenses, moving costs, loss of income, loss of reputation, loss of enjoyment of life, and other losses, both tangible and intangible.

169.   Plaintiff is entitled to full, just and reasonable compensation for all of her damages, including actual damages and compensatory damages, both tangible and intangible, and for costs, attorney fees and such other relief as may be awarded by the Court.

### FOURTH CLAIM FOR RELIEF

VIOLATION OF CIVIL RIGHTS – FOURTH AMENDMENT
Against the Town of Thermopolis, the County of Hot Springs, the
Thermopolis Police Department, the Joint Law Enforcement Center, and
Officer Jeff Brown

170.   Plaintiff realleges all preceding paragraphs as though fully set forth herein.

171.   The Defendants, individually, and in concert with each other have continuously, arbitrarily, and capriciously conspired to violate the Plaintiff's rights as guaranteed by the Unlawful Search and Seizure Clause of the Fourth Amendment to the Constitution of the United States, and Article 1, §§4 and 33 of the Constitution of the State of Wyoming.

172.   The Defendants intentionally committed acts that violated Plaintiff's federal and state constitutional rights not to be subjected to an unreasonable search of one's home and not to be subjected to seizure without warrant.

173.   Defendant Jeff Brown illegally searched Plaintiff's home and illegally without warrant confiscated all items that she could use for self defense against the people who continually stalked, harassed, and assaulted her.

174.   In addition to illegally searching Plaintiff's home, the Defendants in concert with each other, also attempted to seize property belonging to Plaintiff while she was walking on the public street, using the threat of false criminal charges and arrest to achieve this improper and illegal goal.

175.   Plaintiff was able to thwart these attempts, at serious risk to her life and health, but on the final attempt, the Defendants followed through on her threat to have her charged with a crime for merely defending herself against the robbers.

176.    The Defendants were acting "under color" of the authority of the State.

177.    The Defendants' acts were the proximate of legal cause of damages sustained by the Plaintiff.

178.    As a result of this conduct, Plaintiff suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, humiliation, medical expenses, legal expenses, moving costs, loss of income, loss of reputation, loss of enjoyment of life, and other losses, both tangible and intangible, all in an amount to be determined at trial.

179.    Plaintiff is entitled to full, just and reasonable compensation for all of her damages, including actual damages and compensatory damages, both tangible and intangible, and for costs, attorney fees and such other relief as may be awarded by the Court.

## FIFTH CLAIM FOR RELIEF
### MALICIOUS PROSECUTION
Against the State of Wyoming, the County of Hot Springs, the Town of Thermopolis, the Thermopolis Police Department, the Joint Law Enforcement Center, Joseph Christman, Dean Waltz, Jeanne Waltz, Las Fuentes Restaurant, William Gordon, Jeff Brown, and DOEs Number 4-n

180.    Plaintiff realleges all preceding paragraphs as though fully set forth herein.

181.    The Defendants, individually, and in concert with each other arbitrarily, capriciously, with no probable cause, and with wonton disregard for the truth, maliciously caused a criminal proceeding to be brought against the Plaintiff.

182.    Defendants Joseph Christman and Dean Waltz falsely reported to police that Plaintiff had committed a crime, in order to cause plaintiff to be falsely charged with that crime.

183.    In fact, Plaintiff was attacked by owners or employees of Las Fuentes Restaurant on property belonging to Dean and Jeanne Waltz.

31

184.    Las Fuentes Restaurant, Dean Waltz and Jeanne Waltz failed to train and supervise their employees and allowed them to commit torts against Plaintiff on Las Fuentes' sidewalk, or alternatively, Las Fuentes Restaurant, Dean Waltz, and Jeanne Waltz actively participated in torts against Plaintiff.

185.    Defendants Joseph Christman, Dean Waltz, and DOEs 4 - n filed false written statements to be included in the police report.

186.    The Town of Thermopolis, the Thermopolis Police Department, the Joint Law Enforcement Center, Officer Jeff Brown and Officer William Gordon knew that these oral and written statements were false.

187.    Defendant Jeff Brown, in concert with Defendants Gordon, Joseph Christman, Dean Waltz, and DOEs Number 4 - n, conspired to produce a police report that contained numerous errors, omissions, and outright lies, and failed to include exculpatory evidence of which they were aware, knowing that the County Attorney would rely on this false police report in deciding whether or not to prosecute.

188.    This was an abuse of power. Such power was possessed by Defendants Brown and Gordon while they were purporting or pretending to act in the performance of their official duty, but they possessed that power only because of the position they held as police officers.

189.    Defendants knew there were no grounds that any reasonable person would believe for citing Plaintiff and causing her to be prosecuted for a crime.

190.    The Defendants committed these acts for a purpose other than to bring Plaintiff to justice. Specifically, Defendants Christman, Waltz, and DOE Number 4 originally planned to rob Plaintiff, and when that failed, they planned to use these false criminal charges to force Plaintiff to turn over the personal property that they had been trying to steal.

191.    Alternately, the Defendants committed these acts in revenge against Plaintiff because the Plaintiff had previously exercised her constitutionally protected right to file a grievance.

192. The criminal case ended in Plaintiff's favor when the charges were dropped.

193. Defendants' conduct in filing false police reports, failure to investigate, and failure to properly supervise their employees were substantial factors in causing Plaintiff harm.

194. As a result of this conduct, Plaintiff suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, humiliation, embarrassment and worry, fear, medical expenses, legal expenses, moving costs, loss of income, loss of reputation, loss of enjoyment of life, and other losses.

195. Plaintiff is entitled to full, just and reasonable compensation for all of her damages, including actual damages and compensatory damages, both tangible and intangible, and for costs, attorney fees and such other relief as may be awarded by the Court.

## SIXTH CLAIM FOR RELIEF

VIOLATION OF CIVIL RIGHTS – SIXTH AMENDMENT
Against the State of Wyoming, Louis Walrath, and Jerry Williams

196. Plaintiff realleges all preceding paragraphs as though fully set forth herein.

197. The Defendants have arbitrarily and capriciously violated the Plaintiff's rights guaranteed by the Sixth Amendment to the Constitution of the United States, and Article 1, §§6 and 20 of the Constitution of the State of Wyoming.

198. Plaintiff had a Sixth Amendment right to an attorney, but at the arraignment Defendant Walrath insisted that Plaintiff enter a plea before she was represented by an attorney.

199. Plaintiff had a Sixth Amendment right to a speedy trial.

200. Plaintiff had a Sixth Amendment right to know the nature of the charges against her and receive copies of witness statements and to receive exculpatory evidence.

201. Plaintiff repeatedly demanded a speedy trial and Disclosure and Discovery of witnesses and evidence (including exculpatory evidence.)

202. Defendants refused to provide all of the requested Disclosure and Discovery.

203. Instead of providing the requested information and exhibits, Defendants dismissed the case. However, the dismissal was defective as it was without prejudice, did not name the judge or magistrate who allegedly signed the Order, and the Order was allegedly signed on a non-existent date.

204. The State of Wyoming and Jerry Williams have regularly engaged in a practice of dismissing criminal cases without prejudice, solely for the improper purpose of tolling the statute of limitations, and thereby depriving defendants of their constitutional right to a speedy trial.

205. The State of Wyoming and Jerry Williams have regularly engaged in the custom of dismissing criminal cases without prejudice, in order to prevent the wrongly accused from suing for malicious prosecution.

206. In a letter to Plaintiff, Defendant Jerry Williams wrote that "dismissal without prejudice is the standard dismissal done in criminal cases…" Mr. Williams stated that the only way the State would dismiss a case with prejudice is if the defendant pleads guilty to some other charge. Thus, this practice of depriving defendants a speedy trial is the regular policy or custom of the State.

207. This regular policy or custom by the State of Wyoming constitutes deliberate indifference to the constitutional rights of the accused.

208. The Defendants' acts were the proximate or legal cause of damages sustained by the Plaintiff.

209. As a result of the aforesaid violations of Plaintiff's constitutional rights, Defendants are liable to Plaintiff for damages.

210. As a result of the unconstitutional policies of the Defendants, Plaintiff suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, humiliation,

34

embarrassment and worry, fear, medical expenses, legal expenses, loss of income, loss of reputation, loss of enjoyment of life, and other losses, both tangible and intangible.

211.   Plaintiff is entitled to full, just and reasonable compensation for all of her damages, including actual damages and compensatory damages, both tangible and intangible, and for costs, attorney fees and such other relief as may be awarded by the Court.


## SEVENTH CLAIM FOR RELIEF
BREACH OF CONTRACT

Against the Town of Thermopolis, William Gordon, and
the Thermopolis Police Department, acting as the Animal
Control Authority (or alternately, DOE Number 3)

212.   Plaintiff realleges all preceding paragraphs as though fully set forth herein.

213.   The Town contracts with the Hot Springs Veterinary Clinic to provide veterinary services for the Town, including providing two kennels and runs for the boarding or impounded dogs and seven cages for the boarding of impounded cats.

214.   On July 17, 2008, an employee of the Town, Defendant Jeff Brown, impounded an unlicensed Border Collie that had been running loose for several weeks.

215.   On July 17, 2008, Defendant Brown signed over the animal to the Hot Springs Veterinary Clinic.

216.   The document Defendant Brown signed was a release form that stated, "The animal is to be kept and handled in an acceptable manner for 3 days, after which time this animal can be euthanized and/or disposed of by the employees of Hot Springs Veterinary Clinic."

217.   Pursuant to Thermopolis Municipal Code, Section 4-309, such animal may be euthanized or sold if unclaimed.

218.   No one claimed the animal or even contacted the Hot Springs Veterinary Clinic to inquire about the dog.

219.    On July 24, 2008, the Hot Springs Veterinary Clinic and/or the Thermopolis Animal Control Authority assigned its interest in its contract with the Town to Plaintiff when it entered into a contract with the Plaintiff for the purchase of the aforementioned abandoned personal property.

220.    Plaintiff paid the full, usual, and customary price for the animal.

221.    Plaintiff took immediately delivery of the animal, spent additional sums to care for him, and immediately performed all things required of her by Law and contract.

222.    Plaintiff immediately obtained a license, as required by W.S. §11-31-211, from William Gordon, who was acting as agent for the Town of Thermopolis. Defendant Gordon, acting as an agent of the Town, affirmed Plaintiff's contract with the Town and the Animal Control Authority when he issued the license.

223.    Within eight days, the Town began inventing outrageous methods to breach the contract, including threats, harassment, refusal to provide police protection, defamation, and ultimately participating in a conspiracy to defraud Plaintiff of the property by fraudulent use of the civil and criminal court system. These acts included directing Town employees to contact Plaintiff and threaten civil lawsuits and criminal charges against her, encouraging Town employee, Defendant Harrington, to insinuate himself into a civil case by seating himself on the Circuit Court bench without authority, encouraging and suborning perjury by three of its police officers and encouraging or requiring a police officer to file a fraudulent police report and issue a fraudulent criminal citation against Plaintiff.[15]

224.    The Defendants' acts were the proximate of legal cause of damages sustained by the Plaintiff.

225.    As a result of this conduct, Plaintiff suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, humiliation, fear and worry, medical expenses, legal expenses, moving costs, loss of income, loss of reputation, loss of enjoyment of life, and other losses, both tangible and intangible.

226.   Plaintiff is entitled to full, just and reasonable compensation for all of her damages, including actual damages and compensatory damages, both tangible and intangible, and for costs, attorney fees and such other relief as may be awarded by the Court.

## EIGHTH CLAIM FOR RELIEF

NEGLIGENCE
Against the Town of Thermopolis, the Thermopolis Police Department,
acting as the Animal Control Authority (or alternately DOE Number 3),
Jeff Brown, and Kathy Inman

227.   Plaintiff realleges all preceding paragraphs as though fully set forth herein.

228.   Defendants failed to exercise reasonable care in protecting and accounting for the impounded animals under their control.

229.   Officers of the Thermopolis Police Department have admitted under oath that the Thermopolis Animal Control Authority was negligent in the handling of the personal property that they sold to Plaintiff.

230.   The Defendants' acts were the proximate of legal cause of damages sustained by the Plaintiff.

231.   As a result of this negligence, Plaintiff suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, humiliation, medical expenses, legal expenses, moving costs, loss of income, loss of reputation, loss of enjoyment of life, and other losses, both tangible and intangible, all in an amount to be determined at trial.

232.   Plaintiff is entitled to full, just and reasonable compensation for all of her damages, including actual damages and compensatory damages, both tangible and intangible, and for costs, attorney fees and such other relief as may be awarded by the Court.

**NINTH CLAIM FOR RELIEF**

INTENTIONAL INFLICTION OF EXTREME EMOTIONAL DISTRESS
Against all parties

233.   Plaintiff realleges all preceding paragraphs as though fully set forth herein

234.   The Defendants have continuously, arbitrarily, and capriciously violated the Plaintiff's rights under 42 U.S. C. §§ 1982, 1983, 1985, 1986, and 1988; 18 U.S.C. §§ 2721 *et seq.*; 5 U.S.C. §552; the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States; and Article 1, §2 (Equality of All); Article 1, §4 (Security Against Search and Seizure); Article 1, §5 (Imprisonment for Debt), Article 1, §6 (Due Process of Law); Article 1, §7 (No Absolute, Arbitrary Power); Article 1, §8 (Courts Open to All; Suit Against State); Article 1, §20 (Right of Petition); Article 1, §33 (Compensation for Property Taken); and Article 1, §34 (Uniform Operation of General Law) of the Constitution of the State of Wyoming.

235.   The Defendants did intentionally and recklessly engage in extreme and outrageous conduct.

236.   This conduct was outrageous in nature, going beyond all the possible bounds of decency.   Such acts are atrocious, and constitute acts which are utterly intolerable in a civilized community.

237.   The Defendants intended for this conduct to cause Plaintiff extreme emotional distress or alternatively, they acted with reckless disregard for the high probability of causing extreme emotional distress.

238.   The Defendants were aware that Plaintiff was especially susceptible to extreme emotional distress, due to her age and heart problems and that such extreme, severe emotional distress could cause an irregular heartbeat, possibly resulting in death.

239.   Defendant's conduct was a legal cause of Plaintiff's extreme emotional distress.

240.  As a result of this conduct, Plaintiff suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, humiliation, embarrassment and worry, fear, medical expenses, legal expenses, moving costs, loss of income, loss of reputation, loss of enjoyment of life, and other losses, both tangible and intangible.

241.  Plaintiff is entitled to full, just and reasonable compensation for all of her damages, including actual damages and compensatory damages, both tangible and intangible, and for costs, attorney fees and such other relief as may be awarded by the Court.

## TENTH CLAIM FOR RELIEF

RESPONDEAT SUPERIOR/FAILURE TO TRAIN AND SUPERVISE
Against the State of Wyoming, the Town of Thermopolis, the County of Hot
Springs, the Joint Law Enforcement Center, and the Thermopolis Police Department

242.  Plaintiff realleges all preceding paragraphs as though fully set forth herein.

243.  While acting within the scope of their employment, Defendants Harrington, Walrath, Messenger, Nelson, Gordon, Brown, Inman, and Williams committed torts against Plaintiff.

244.  A public body or agency such as a city or state owes a duty of care to its citizens to ensure that its employees are properly selected, hired, trained, and supervised.

245.  Defendants have engaged in a pattern and practice of failing to train and supervise their employees.

246.  The Defendants have failed in their duty to properly select competent personnel, properly hire and train them, and then provide regular and substantial supervision.

247.  Such public body is legally responsible for the acts and omissions of its employees.

248.  The Defendants have regularly and continuously maintained official policies or customs that have deprived Plaintiff and others of their constitutional rights.

249.  Defendants State of Wyoming and County of Hot Springs have failed to maintain a fully trained staff, both in the courtroom and in the clerk's office.  When the Circuit Court Judge

is absent, the inmates run the asylum. No one objects when an unauthorized person decides to appoint himself to hear a case; no one watches to see if the court clerks are denying access to public records; no provisions are in place to ensure that all parties receive notice of hearings, continuances, etc.

250. For example: Defendants Joseph and Melissa Christman claimed that they did not receive a notice that the September 26, 2008, trial date had been cancelled. Plaintiff received TWO copies of that order. On the other hand, Plaintiff did not receive notice that a trial date had been scheduled. Later, after Judge Waters vacated the jury verdict and ordered that the Defendants could set a new trial date, Plaintiff called the Circuit Court clerk and asked if anything had been filed. The clerk insisted that NOTHING had been filed. But the Defendants had filed an appeal four days earlier. Plaintiff never got the notice from the Circuit Court Clerk. Plaintiff's first notice of the pending appeal came from the District Court Clerk when she sent Plaintiff the Certification of the Record on Appeal, typed and signed by Circuit Court Clerk, Bonnie Smith, and containing numerous typographical errors.

251. When someone typed the Order dismissing Plaintiff's criminal case, no one typed in the name of the judge or magistrate, and his signature is illegible. No one noticed that the date February 29, 2009, does not exist. When Magistrate Walrath signed an order regarding the attorney fees for Plaintiff's court-appointed attorney, the order said that Plaintiff was not responsible for repaying the attorney's fees and costs, but in the same document, Magistrate Walrath set forth a repayment schedule! No one noticed and no one contacted Plaintiff to find out what happened to the first payment. No one has taught the police or the court clerks what is public record and what is not, and they have not been instructed that when a document is public record, the public has the right to see it.

252. The State of Wyoming, the Town of Thermopolis, the Thermopolis Police Department, Hot Springs County, and the Joint Law Enforcement Center have as a regular policy ignored the provisions of the Driver's Privacy Protection Act.

253.   The Thermopolis Police Department and Defendant Walrath have a policy or practice of ignoring Postal Regulations and putting unstamped notices in the mailboxes of citizens in violation of federal law.

254.   The State of Wyoming, The Town of Thermopolis, and Hot Springs County, have failed to maintain acceptable ethical standards among their lawyers and judges, including their duty to avoid conflict of interest situations.

255.   For instance: No one in the State seems to understand the conflicts inherent in allowing the same judge to serve on both the municipal bench and the Circuit Court bench, while also having a private practice on the side.  Defendant Walrath is in private practice, serves as municipal judge, is a part-time Circuit Court Magistrate, and also a part-time District Court Magistrate.  So, theoretically, Defendant Walrath can sue the Town in Circuit Court on behalf of his private client.  If he loses, he can appeal to the District Court, and then, putting on his District Court Hat, he can decide his own appeal!  (Who would know, since the signatures are illegible!)

256.   The Town of Thermopolis, the Thermopolis Police Department, the Joint Law Enforcement Center, and Hot Springs County have regularly allowed their employees to discriminate against some citizens and for others.

257.   For example:  Defendants regularly enforce ordinances regarding store-owners displaying items on the sidewalk – against <u>some</u> store owners.  But Las Fuentes Restaurant not only has items on its sidewalk, but there is actually a barricade on the public sidewalk, and chairs and tables set up inside the barricade, extending Las Fuentes Restaurant's operating space beyond the confines of the building and into the public walkway.

258.   Another example:  Defendants regularly enforce the animal control laws – against <u>some</u> citizens.  But when they think they may have accidently impounded an animal belonging to one of the "elite" of the Town, they use extreme and illegal methods to undo their "misdeed."  In fact, Defendant Nelson testified under oath that they would not have required Defendant Joseph Christman to pay the fine or impound fees in order for him to claim his dog.

41

259.    The Defendants knew that their courses of conduct were illegal, discriminatory and were harming innocent citizens, but they failed to change their policies or customs, which remained in force over such a long period of time that their illegal policies and customs acquired the force of law without formal adoption or announcement.

260.    Plaintiff's deprivation of her constitutional rights was the direct result of the Defendants' illegal and discriminatory policies and customs, their hiring of incompetent and unqualified staff, and their failure to properly train and supervise their employees.

261.    As a direct result of the failure of the Defendants to use reasonable care in hiring, training and supervising their employees, and as a direct result of Defendants' failure to restrict or control the aforementioned improper, illegal, persistent, widespread and repetitious course of conduct by their public employees, Plaintiff suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, humiliation, medical expenses, legal expenses, moving costs, loss of income, loss of reputation, loss of enjoyment of life, and other losses.

262.    Plaintiff is entitled to full, just and reasonable compensation for all of her damages, including actual damages and compensatory damages, both tangible and intangible, and for costs, attorney fees and such other relief as may be awarded by the Court.

## ELEVENTH CLAIM FOR RELIEF
### PUNATIVE DAMAGES
### Against all parties

263.    Plaintiff realleges all preceding paragraphs as though fully set forth herein.

264.    Defendants had a specific intent to cause harm to Plaintiff.

265.    The unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct was known by the Defendants.

266.    The Defendants' acts were the proximate of legal cause of damages sustained by the Plaintiff.

267.    The conduct of the Defendants as alleged above individually, and in concert with each other, was willful, wanton, and malicious, and with total disregard of the Plaintiff's rights. As a result, Plaintiff is entitled to an award of punitive damages in an amount to be determined by a jury.

## OTHER CLAIMS

268.    Plaintiff stated twenty claims and some additional parties in her Notice of Claim, but, in spite of editing out almost half the pages, this document remains in excess of 40 pages.

269.    Plaintiff reserves the right to amend her Complaint to add additional claims and additional parties, if any of the defendants ask for dismissal on grounds that Plaintiff has failed to join all necessary parties, if any party alleges counterclaims against Plaintiff, or if any party asks for dismissal on grounds that Plaintiff failed to state a claim upon which relief could be granted. Some of the claims that Plaintiff omitted include, assault and battery, vehicular assault, false imprisonment, abuse of process, prosecutorial misconduct, impersonating a judge, and malpractice. With the exception of the malpractice claim (against White & White P. C. and Jeff Stanbury, who are not currently named as parties), Plaintiff believes these additional claims could be included under the umbrella of her "Extreme Emotional Distress" claim.

270.    Plaintiff reserves the right to amend her Complaint to correct typographical errors.

271.    Plaintiff reserves the right to dismiss her claims against any party who cannot be located and/or served, so that this case may proceed against the remaining parties.

272.    Plaintiff reserves the right to hire an attorney to prosecute her claims.

273.    Plaintiff has suffered grievous injuries and damages, including but not limited to those set forth above.

274.  Plaintiff is entitled to recover from Defendants all damages proximately caused by the aforesaid Defendants' wrongful acts.

275.  The conduct of the Defendants as alleged above individually, and in concert with each other, was willful, wanton, and malicious, and with total disregard of the Plaintiff's rights and welfare.  As a result, Plaintiff is entitled to an award of punitive damages in an amount to be determined by a jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully requests that this Honorable Court enter judgment on behalf of the Plaintiff, and against the Defendants, jointly and severally, as follows:

- Judgment for recovery of an amount that will fairly compensate Plaintiff for her damages including compensatory damages, punitive damages, past and future lost wages, past and future medical expenses, past and future lost rental income, moving expenses, pain and suffering, attorney's fees and costs, pre and post judgment interest, and other costs as more fully described in her Notice of Claim.
- An injunction against the State of Wyoming, enjoining it from disclosing protected personal information obtained from Driver's License applications, except as specifically permitted by the Driver's Privacy Protection Act.
- An injunction against the State of Wyoming, enjoining it from dismissing criminal cases without prejudice absent one of the grounds for continuance specified in Rule 48 of the Wyoming Rules of Criminal Procedure, or alternatively, a Declaratory Judgment that would permit a suit for Malicious Prosecution to commence whenever the State has dismissed the case without prejudice simply to avoid such Malicious Prosecution Lawsuit.
- A Declaratory Judgment that Rule 48(b)(3)(c) of the Wyoming Rules of Criminal Procedure is unconstitutional, because it allows the State to toll the statute of limitations

indefinitely, for any reason at all – or no reason – depriving the accused of the right to a speedy trial.

- A Declaration of whether or not an Order of Dismissal of a criminal case signed on a non-existent date by an unnamed judge or magistrate is valid.

- A Declaratory Judgment that dogs and cats purchased from local animal shelters and humane societies are final and protected by the Sales provisions of the UCC, specifically, that a seller with a voidable title has power to transfer good title to a good faith purchaser for value.

- A restraining order against Defendants Joseph Christman, Melissa Christman, Dean Waltz, Jeanne Waltz, Mark Nelson, Jeff Brown, and William Gordon, enjoining them from assaulting, harassing, or contacting Plaintiff in any manner, and requiring that, in any location outside of Hot Springs County, Wyoming, they maintain a distance from Plaintiff of at least 100 feet.

- and for such other and further relief as the court deems just and proper.


RESPECTFULLY SUBMITTED this _____ day of _____, 2009.


By_____

Neva Freiermuth, *pro se*
P. O. Box 93
Worland WY 82401-0093
(307) 921-2428

45

**VERIFICATION**

STATE OF WYOMING )

COUNTY OF ~~WASHAKIE~~ Big Horn Se )

The undersigned, being first duly sworn on oath, deposes and says that she is the Plaintiff mentioned in the foregoing Complaint, that she has read the same and knows the contents thereof, and that the statements therein contained are true and correct to the best of her own knowledge, information and belief.

*Neva Freiermuth*
Neva Freiermuth

Subscribed and sworn to before me by Neva Freiermuth this 28th day of *August*, 2009.

Witness my hand and official seal.

*Sherri Emmett*
Notary Public

My Commission expires: ___8/27/2010___

SHERRI EMMETT    NOTARY PUBLIC
COUNTY OF    STATE OF
BIG HORN    WYOMING
MY COMMISSION EXPIRES AUGUST 27, 2010

Endnotes:

---

[1] Plaintiff suffers from a number of disabilities, all of which affect her physical strength, mobility and/or ability to defend herself. These include, arthritis, osteoporosis, Post Polio Syndrome, Prosopagnosia, bunions, a Morton's Neuroma, and episodes of Supra Ventricular Tachycardia.

[2] The Thermopolis Animal Control Authority is defined by Thermopolis Municipal Code, Sec. 4-301(a)– Definitions as, *"The provisions of this Article shall be enforced by the Animal Control Authority, which shall consist of those persons so designated by the Town Council. (Ord. No. 484, 4/13/67, 1)."*

[3] Where there is clearly no jurisdiction over the subject matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. *Bradley v. Fisher*, 80 U.S. 13 Wall. 335 (1871)

[4] *Connor v. Bogrett,* 596.P.2d 683 (Wyo, 1979.)

[5] The complaint that Plaintiff sent to the Town on September 2, 2008, clearly stated that the license plate number was 15-4363, not 15-4729, the vehicle 911 Dispatcher Gordon sent a police officer to look for. What is interesting is that Defendant Gordon knew the vehicle that Defendant Christman usually drives. The police report said that it was not registered to Defendant Christman. So Defendant Gordon couldn't have looked it up on his computer. Defendant Gordon was obviously close enough friends with Joseph Christman to know the description of the vehicle he usually drove, but he was also close enough to the family to know to whom the vehicle belonged. Otherwise, he couldn't have found the plate number in his computer.

Another thing, the Town was informed that there was a problem with Officer Gordon no later than September 3, 2008, when it received Plaintiff's first complaint in the mail, but Town officials didn't investigate him, discipline him, or apparently save the 911 tape, even though they knew the tape would be necessary if Plaintiff filed the promised lawsuit. The Town must have known that the 911 tape would substantiate Plaintiff's claim, so the only reason for destroying it would have been to destroy evidence that the 911 dispatcher was refusing to aid Plaintiff when she was being attacked by a known criminal and possibly having a heart attack, as well.

[6] Rule 41(a)(1) confers on the plaintiff "an absolute right to voluntarily dismiss his action prior to service by the defendant of an answer or a motion for summary judgment . . . This 'absolute right' for a plaintiff voluntarily to dismiss an action when the defendant has not yet served and answer or a summary judgment motion leaves no role for the court to play. The language of rule 41(a)(1) is unequivocal. It permits a plaintiff to dismiss an action "without order of court." . . . "The filing of notice itself closes the file. There is nothing the defendant can do to fan the ashes of that action into life and the court has no role to play. This is a matter of right running to the plaintiff and may not be extinguished or circumscribed by adversary or court. There is not even a perfunctory order of court closing the file. Its alpha and omega was the doing of the plaintiff alone. . . We conclude that it was error to vacate the voluntary dismissal, and that American Soccer's notice of voluntary dismissal filed on March 20, 1997 must be given effect. The district court therefore was without jurisdiction to rule on the merits of the case." *American Soccer Co., Inc. v. Score First Enterprises, a Div. of Kevlar Industries*, 187 F.3d 1108, 1109 (9th Cir. 1999).

---

[7] For additional case law on Rule 41(1)(a)(i), see also: *Peters v. West Park Hospital*, 2003 WY 117, 76 P.3d 821, *Rawlinson v. Wallerich* 132 P.3d 204 (WY 2006), *Claims of Moriarity*, 899 P.2d 879 (WY 1995), *Marex Titanic, Inc. v. Wrecked and Abandoned Vessel*, 2 F.3d 544, 545 (4th Cir. 1993), *American Soccer Co., Inc. v. Score First Enterprises, a Div. of Kevlar Industries*, 187 F.3d 1108, 1109 (9th Cir. 1999), *Janssen v. Harris*, 321 F.3d 998 (10th Cir 2003), *Safeguard Business Sys, Inc. v. Hoeffel*, 907 F.2d 861, 864 (8th Cir. 1990); *Wilson v. City of San Jose*, 111 F.3d 688 (9th Cir. 1997.) *Duke Energy Trading & Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1049 (9th Cir. 2001). *Marex Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 2 F.3d 544, 546 (4th Cir. 1993), *Matthews v. Gaither*, 902 F.2d 877, 880 (11th Cir. 1990), *Szabo Food Serv., Inc. v. Canteen Corp*., 823 F.2d 1073, 1078 (7th Cir. 1987); *Randall v. Merrill Lynch*, 820 F.2d 1317, 1320 (D.C. Cir. 1987); *Santiago v. Victim Servs. Agency of Metro. Assistance Corp*., 753 F.2d 219, 221 (2d Cir. 1985) *Valley Disposal, Inc. v. Central Vermont Solid Waste Mgmt. Dist*,, 71 F.3d 1053, 1055 (2d Cir. 1995); *Gardiner v. A.H. Robins Co.*, 747 F.2d 1180, 1190 (8th Cir. 1984; *D.C. Elecs., Inc. v. Nartron Corp*., 511 F.2d 294, 298 (6th Cir. 1975), *EOG Resources, Inc. v. State*, 2003 WY 34, 64 P.3d 757; ); *Carter v. United States*, 547 F.2d 528, 529 (5th Cir. 1977.) *Williams v. Ezell*, 531 F.2d 1261 (5th Cir 1976.) *McCrary v. Poythress*, 638 F.2d 1308, 1314 (5th cir. 1981.) *Geaney v. Carlson*, 776 F.2d 140, (7th Cir. 1985.) *Aero-Colours Inc. v. Propst*, 833 F.2d 51 (5th Cir. 1987.); *Alphe Spacecom, Inc. v. Zuedong Hu*, 05CA1244, (Colorado Court of Appeals 2007.) . *State of Missouri v. Coeur D'Alene Tribe*, (8th cir. 1999.) *Becenti v. Becenti*, Opinion Number 2004-NMCA-091, New Mexico Court of Appeals. *Winterland Concessions Co v. Smith*, 706 F.2d 793. (7th Cir. 1983.); *Santiago v. Victim Services Agency*, 753 F.2d 219 (1985); *Granite Springs Retreat Association, Inc. V. Art and Kay Manning*, 2006 WY 60, 133 P.3d 1005. *Rini v. Rini*, 2002-Ohio 6480; *Becenti v. Becenti*, Opinion Number 2004-NMCA-091, New Mexico Court of Appeals.

[8] Plaintiff was entitled to rely on the dismissal of her action and was within her legal right when she signed ownership of the dog over to another person prior to the Motion for Relief from Order of Dismissal that the Defendants filed almost two months after their Answer was due, and almost two months after Plaintiff had voluntarily dismissed the case.

[9] *Irvine v. State*, 658 p.2d 64 (WY 1983).

[10] The Defendants were served on August 13, 2008, so their answer would have been due by September 2, 2008.

[11] Post Polio Syndrome affects not only muscle strength, but also balance.

[12] The Christmans claimed that they had contacted the Animal Control Officer, Laura Inman on July 20, 2008, but changed their story when Defendant Walrath happened to notice that July 20th was a Sunday. Laura Inman agreed to testify that she had not been contacted, so her mother was persuaded to testify that she had been the person the Christmans had contacted. There were numerous discrepancies in Kathy Inman's testimony and in the document that purported to be the police report of the call. But regardless, anyone who actually owned and cared for their pet would do more than make one phone call (on a Sunday, when the when the Animal Shelter was closed) to try to find their dog. Further, no one ever paid the fine, boarding fees, or rabies license fee, as required by municipal code.

[13] *Reno v. Condon*, 528 U.S. 141, (2000)

[14] See *LaMare v. North Country Animal Rescue*, 743 A.2d 598, Supreme Court of Vermont, 1999

[15] One of the attorneys Plaintiff contacted suggested she have the dog X-Rayed to find out if anything had been hidden inside of the dog that they wanted back, but Plaintiff had already given the dog away.