NOTICE OF CLAIM

The following claim is submitted as an itemized written claim in accordance with the Wyoming Governmental Claim Act  (W.S. 1-39-113 (a)(b))

| | |
|---|---|
| This claim is submitted to the | State of Wyoming |
| | Department of Administration and Information |
| | General Services Division |
| | Richard Cathcart, Administrator |
| | 1920 Thomes Ave., Suite 310 |
| | Cheyenne, WY 82002 |
| The claimant is: | Neva Freiermuth |
| Current Mailing address: | P. O. Box 93 |
| | Worland WY 82401-0093 |
| Claimant's physical address was | 715 Arapahoe St |
| | Thermopolis Wyoming |
| Dates of injury: | September 2008 through April 2009 |

See attached for details and circumstances of the losses and injuries

Names of public employees involved, Mark Nelson, Bill Gordon, Jeff Brown, Michael Messenger, Thomas Harrington, Louis Walrath, Jerry Williams

List of damages and amount of compensation demanded:

| | |
|---|---:|
| Lost rental income | $84,000.00 |
| Lost wages | 60,000.00 |
| Loss on sale of home | 20,000.83 |
| Moving Expenses | 1,697.40 |
| Cell phone | 973.16 |
| Violation of Driver's Privacy Act | 2,500.00 |
| (Liquidated damages -- Actual damages may be higher) | |
| Illegally confiscated personal property | 77.47 |
| handgun | 157.50 |
| medical and dental bills | 210.00 |
| gas, paper, ink, postage (very conservative estimate) | 400.00 |
| Cost to mail Notices of Claim | 30.37 |
| jury fee | 50.00 |
| legal | <u>3,715.85</u> |
| Total claimed at this time | $173,812.58 |

This is only a partial list.  If a lawsuit is necessary, I will do a more thorough accounting and claim damages for pain and suffering, damage to reputation, damage to enjoyment of life, punative damages, additional attorney fees etc.

I, Neva Freiermuth, certify under penalty of perjury and subject to the provisions of W.S. 6-5-303 and its penalties, that the foregoing claim is a true and accurate record claim for damages for expenses incurred by me.  I do further certify that no part of the foregoing claims have been paid or incurred by any other source.

_Neva Freiermuth_  (signature)          7-13-09

## NOTICE OF CLAIM

The following claim is submitted as an itemized written claim in accordance with the Wyoming Governmental Claim Act (W.S. 1-39-113 (a)(b))

| | |
|---|---|
| This claim is submitted to the | Town of Thermopolis<br>420 Broadway<br>Thermopolis WY 82443 |
| The claimant is:<br>Current Mailing address: | Neva Freiermuth<br>P. O. Box 93<br>Worland WY 82401-0093 |
| Claimant's physical address was | 715 Arapahoe St<br>Thermopolis Wyoming |
| Dates of injury: | September 2008 through April 2009 |

See attached for details and circumstances of the losses and injuries

Names of public employees involved, Mark Nelson, Bill Gordon, Jeff Brown, Michael Messenger, Thomas Harrington, Louis Walrath, Jerry Williams

List of damages and amount of compensation demanded:

| | |
|---|---:|
| Lost rental income | $84,000.00 |
| Lost wages | 60,000.00 |
| Loss on sale of home | 20,000.83 |
| Moving Expenses | 1,697.40 |
| Cell phone | 973.16 |
| Violation of Driver's Privacy Act | 2,500.00 |
| (Liquidated damages -- Actual damages may be higher) | |
| Illegally confiscated personal property | 77.47 |
| handgun | 157.50 |
| medical and dental bills | 210.00 |
| gas, paper, ink, postage (very conservative estimate) | 400.00 |
| Cost to mail Notices of Claim | 30.37 |
| jury fee | 50.00 |
| legal | 3,715.85 |
| Total claimed at this time | $173,812.58 |

This is only a partial list. If a lawsuit is necessary, I will do a more thorough accounting and claim damages for pain and suffering, damage to reputation, damage to enjoyment of life, punative damages, additional attorney fees etc.

I, Neva Freiermuth, certify under penalty of perjury and subject to the provisions of W.S. 6-5-303 and its penalties, that the foregoing claim is a true and accurate record claim for damages for expenses incurred by me. I do further certify that no part of the foregoing claims have been paid or incurred by any other source.

_____          _____
        [signature]                         7-13-09

## NOTICE OF CLAIM

The following claim is submitted as an itemized written claim in accordance with the Wyoming Governmental Claim Act (W.S. 1-39-113 (a)(b))

This claim is submitted to the     Hot Springs County
                                                415 Arapanoe St
                                                Thermopolis WY 82443

The claimant is:                    Neva Freiermuth
Current Mailing address:     P. O. Box 93
                                                Worland WY 82401-0093

Claimant's physical address was    715 Arapahoe St
                                                Thermopolis Wyoming

Dates of injury:                   September 2008 through April 2009

See attached for details and circumstances of the losses and injuries

Names of public employees involved, Mark Nelson, Bill Gordon, Jeff Brown, Michael Messenger, Thomas Harrington, Louis Walrath, Jerry Williams

List of damages and amount of compensation demanded:

| | |
|---|---:|
| Lost rental income | $84,000.00 |
| Lost wages | 60,000.00 |
| Loss on sale of home | 20,000.83 |
| Moving Expenses | 1,697.40 |
| Cell phone | 973.16 |
| Violation of Driver's Privacy Act | 2,500.00 |
| (Liquidated damages – Actual damages may be higher) | |
| Illegally confiscated personal property | 77.47 |
| handgun | 157.50 |
| medical and dental bills | 210.00 |
| gas, paper, ink, postage (very conservative estimate) | 400.00 |
| Cost to mail Notices of Claim | 30.37 |
| jury fee | 50.00 |
| legal | 3,715.85 |
| Total claimed at this time | $173,812.58 |

This is only a partial list. If a lawsuit is necessary, I will do a more thorough accounting and claim damages for pain and suffering, damage to reputation, damage to enjoyment of life, punative damages, additional attorney fees etc.

I, Neva Freiermuth, certify under penalty of perjury and subject to the provisions of W.S. 6-5-303 and its penalties, that the foregoing claim is a true and accurate record claim for damages for expenses incurred by me. I do further certify that no part of the foregoing claims have been paid or incurred by any other source.

_NF Freiermuth_                                         _7-13-09_

Neva Freiermuth
P. O. Box 93
Worland WY 82401-0093
July 11, 2009

This is a claim against the Town of Thermopolis; the County of Hot Springs Wyoming; the State of Wyoming; the Joint Law Enforcement Center; employees of The Town of Thermopolis; Michael Messenger, Thomas Harrington, Officer Bill Gordon, Officer Jeff Brown, Chief Mark Nelson; employees of the County of Hot Springs, Jerry Williams, Kristina McNeff; and others including, but not limited to Joseph Christman, Melissa Christman, Louis Walrath, Dean Waltz, Las Fuentes Restaurant, White & White PC, Jeff D. Stanbury, and the Hot Springs Veterinary Clinic.

Although this narrative includes events which occurred prior to and after these dates, most of the events for which I am claiming damages occurred between September 1, 2008, and February 26, 2009.

I am a disabled senior citizen, suffering from arthritis, osteoporosis, Post-Polio Syndrome (PPS), Prosopagnosia, episodes of Supraventricular Tachycardia (SVT), a Morton's Neuroma, bunions, and other ailments, all of which prohibit or limit my ability to run away or defend myself when attacked. I had been living on a widow's pension from Social Security and a part time job with the U.S. Census Bureau, with some additional income from renting a little house behind my house. Now that income is cut in half, and I have had to move to a different county, losing friends and contacts, as well as income.

Shortly after moving to Thermopolis, I discovered that the public officials Town of Thermopolis and the County of Hot Springs have a regular practice of discriminating against some citizens and in favor of others. For example:

- Whenever a "privileged" citizen is caught driving off without paying for gas, it will be reported in the newspaper that the citizen "accidently" forgot to pay and went back to pay for the gas. His or her name is not even mentioned in the newspaper report. But when a non-privileged person accidently drives off without paying for gas, he is arrested and his name is reported in the newspaper.

- Whenever a good job that is required to be advertized became open, it always turned out that the job was already filled by the son or daughter of one of the Town's "elite" before it was ever advertized.

- When my dog Chewy was severely bitten by a dog who had been allowed to roam free, I reported it to a policeman, (Officer Regan, I think his name was.) I carefully gave the address and description of the dog and showed him my dog's injuries. But when the incident was reported in the newspaper the next week, I found that the officer deliberately misreported the incident to protect the owner (who must have been one of Thermopolis' "elite" citizens.) The address reported in the newspaper was not the correct address; the date was wrong; and the report merely stated – incorrectly – that her dog had "growled" at my dog. Obviously he conspired with the owner of the vicious dog to protect her.

1

- When I tried to report that the Town was being ripped off by Burkhard Pohl, who owned the Dinosaur Center, Big Horn Prospecting, Inc., (which operated the Old West Wax Museum), and other businesses, Dan Stansill ignored me. Dr. Pohl, a multi-billionaire, was collecting money from the Town for repairs and other expenses based on his accountants' claim that the museum was losing money. The Town had agreed to pay certain expenses for the museum if the museum was not profitable. But the accountants and the person running the museum, Sue Blakey, started a new "non-profit" foundation, the Hot Springs Greater Learning Foundation. Together with the Big Horn Basin Foundation the Hot Springs Greater Learning Foundation took in some of the income, and Big Horn Prospecting, Inc. paid the bills. Since the Old West Wax Museum was not a separate corporation (had not even filed for a Trade Name,) the accountants could juggle the books however they wanted – mixing the two together for IRS purposes, and separating them out in reports to the Town (with expenses belonging to the Dinosaur Center being allocated to the wax museum and income from the wax museum being allocated to the Non-Profits.) The Town knows, but continues to support the wax museum because Burkhard Pohl is one of Thermopolis' elite.

- When the job of airport manager was advertized, it was given to one of the Town's "elite" instead of the person who bid the lowest and who was the most qualified.

- When some children of the Town's "elite" put some explosive devises in mailboxes, the law enforcement officials knew who was responsible, but these law enforcement officers concealed the identities and protected the culprits, even when the Feds came to town to investigate and even advertised a reward in the *Independent Record*.

I found out that Thermopolis is a hot-bed of illegal drug activity and that some of the Town's most "illustrious" citizens are involved. Although nobody gave me any names at the time, I was told soon after I moved to Thermopolis that these substance abusers included the ~~owners of the~~ ~~[redacted]~~, among others.

Over the course of time, I exercised my rights under the First Amendment to United States Constitution to petition the government. I filed numerous complaints including:

- A complaint to the Police Department;
- A complaint to Dan Stansill;
- A complaint to Michael Messenger's office (was not allowed to talk to him personally);
- A complaint to Jerry Williams;
- I filed a complaint with the FBI alleging government corruption; and
- I filed complaints with the IRS alleging tax evasion.

On July 24, 2008, I purchased a dog from the Town of Thermopolis, through its agent, the Hot Springs Veterinary Clinic.[1] The Town of Thermopolis, through its agent, Officer Bill Gordon, affirmed the contract when it issued a Town License to me for the dog on July 24, 2008.

---

[1] The Hot Springs Veterinary Clinic had obtained the dog from the Joint Law Enforcement Center, through its contract with the Town of Thermopolis. By the terms of the contract between the Town of Thermopolis and the Hot Springs Veterinary Clinic, the contract was assignable. The Hot Springs Veterinary Clinic assigned its interest in the contract, and the dog, to me.

2

Over the next few days, I spent additional sums of money on the dog, for veterinary care, immunizations, food, and supplies.

On July 31, 2008, and on numerous subsequent dates, Joseph and Melissa Christman began assaulting me, falsely imprisoning me, and violently trying to steal the dog from me. At first, the Police Department protected me and Police Chief Mark Nelson agreed to supply me with copies of the various police reports if I would fax him a written request. But Michael Messenger ordered Chief Nelson to stop protecting me, so Chief Nelson suddenly refused to provide me or my attorney with copies of the police reports, ordered his men to ignore any calls I made for help, and ordered his men to let the Christmans steal the dog.

I signed up for cell phone service so I could call 911 if I was attacked on the street again. But on Michael Messenger's orders, the police refused to come when I dialed 911. On one occasion, while running from Joseph Christman, I told Dispatcher Bill Gordon that I thought I was having a heart attack. Even then, Officer Gordon refused to send help. (It turned out it was not a heart attack, but a small stroke. As a result of this, the muscles on the left side of my face are paralyzed and I am no longer able to smile.)

I hired an attorney to file a suit for a restraining order. But Michael Messenger interfered and ordered Town employee Thomas Harrington to insinuate himself into the case, appointing himself to hear the case instead of the judge who was originally supposed to be sitting on the Circuit Court Bench that day. Even though the Christmans came to court with unclean hands, they tried to assert a claim that they were the owners of the dog and that the Town of Thermopolis had made a mistake in selling the dog to me. Since Thomas Harrington was an employee of the Town, he was conflicted out of hearing the case. Further, as a part-time temporary magistrate, he needed the consent of all parties to hear the case. But he refused to recuse himself when my attorney requested he do so, and scheduled a trial anyway on the issue of ownership of the dog, even though he had no authority to do so. Since he was biased, I instructed my attorney to dismiss the case. Part-time temporary Magistrate Harrington ignored the dismissal and ordered the trial held without me. The Circuit Court never even notified me that a trial was going to be held. I found out only after I filed complaints against Harrington. So part-time magistrate Harrington decided to reuse himself, after all, and appointed Louis Walrath to take his place. It was only after Louis Walrath ordered the case dismissed, that I found out that a trial was scheduled.

So I again exercised my First Amendment rights. For example:
- I filed a claim with the Town of Thermopolis, alleging violation of my civil rights and breach of contract, among other things, and stating that I intended to obtain an injunction enjoining the Town from discriminating in favor of business owners and against wage-earners and retirees. I stated that I would be suing Thomas Harrington, Michael Messenger and Bill Gordon personally, as well as the Town, and I asked that Officer Bill Gordon be relieved of dispatching duties.
- I filed a letter with the Wyoming Department of Family Services in which I related some incidents of child abuse and child endangerment committed by the Christmans that I had personally witnessed.

3

- I mailed a letter to the Judicial Nominating Committee (with a copy to Governor Freudenthal) stating the reasons why I thought that Thomas Harrington should not be appointed to the Circuit Court.
- I filed a complaint with the Federal Bureau of Investigation alleging corruption of government officials and illegal distribution of controlled substances to Town and County officials by Defendant Joseph Christman's father, Dean Waltz.
- I filed complaints with the Thermopolis Police Department alleging that the Christmans had been stalking, harassing, and assaulting me, and committing attempted larceny and false imprisonment.

In retaliation, the police department and the Town stepped up their efforts to break the contract. They began using Obama-style strong arm intimidation tactics to force me to give the dog to the Christmans – thus breaching their contract with me. My former next-door neighbor, who was an employee of Michael Messenger, warned me that her boss was the Town Attorney and in charge of enforcing Town laws and that I could be charged with various offences until I complied with their demands. I laughed, thinking she was talking about Code Enforcement, and made sure my weeds were kept mowed. But the intent of the Town was much more insidious.

On October 11, 2008, when I was attempting to defend myself from two huge men who were trying to steal the dog, another man, who I later discovered was Dean Waltz, came up in his vehicle and started screaming that I had stolen his dog. I was not strong enough to hold the dog, who ran away from these evil men and toward our home. I followed as fast as I could run; all the time Dean Waltz was chasing me with his vehicle, revving up his engine as though he would run over me. I called the police as soon as I got home, but it was Officer Gordon who answered. Officer Gordon ordered the responding officer to arrest ME for assault and battery! <u>Outrageous!</u>

Officer Jeff Brown was fully aware that these people had been stalking me and harassing me on a regular bases and that I had filed for a restraining order. In fact he had been a witness to one of their attacks and he said to me as soon as he got to my door, "You shouldn't have dismissed your restraining order." But in spite of that he searched my house without a warrant, confiscated personal property belonging to me, and then wrote a citation against me. I still have a tape recording of the entire assault and my conversation with Officer Gordon and Officer Brown. Officer Gordon admitted that he was angry with me for filing a complaint against him. Officer Brown told me that there was a "restaurant full of witnesses" who would testify that Joe Christman didn't do a thing; that I had just run up to him and stunned him without provocation. I told Officer Brown about my prosopagnosia disorder, and so Officer Brown stated he would question Christman further. When he did, Christman changed his story and admitted that he had "called to the dog." [in an attempt to get the dog to come to him so he could steal him.] Christman also admitted that I warned him to "stay back." (Actually, I warned him three times, "Stay away," "Leave us alone," "Get back," as you can hear on the tape recorder I was carrying in my pocket at the time.) Officer Brown neglected to mention in his report that Christman had changed his story. Any half-wit would have known that I was the <u>victim</u>. But the Police Department refused to arrest any of the people who had assaulted me. And they refused to give me a copy of that police report too, even though I requested it in writing. In fact, I requested it twice, and then my attorney twice requested Discovery.

Some of the Discovery I requested for the criminal trial, which County Attorney Jerry Williams had set for February 10, 2009 included:

- A copy of the police report from the evening of July 31, 2008, when Joe & Melissa Christman accosted me, held me captive, and tried to steal my dog.

- Copies of all other police reports when Joe and/or Melissa Christman stalked and/or harassed me and/or tried to steal my dog.

- Transcript of the 911 tape the call I made at approximately 5:45 a.m. on September 1, 2008, and transcript of other 911 calls I made including the call I made on October 11.

- Copy of the police report from October 11, 2009.

- All police reports relating to Joe or Melissa Christman, including the report of the dog being picked up on July 17, 2008, the report allegedly filed by one of them on July 20, 2008, regarding a lost dog, and any other police reports relating to the dog, including any other times the dog has been found running at large and any reports of abuse or neglect of any animal in their possession.

- All copies of police reports relating to domestic abuse or violence relating to Joe or Melissa Christman.

- All police reports of any assaults by Joe or Melissa Christman on any other citizen, including the one in which Joseph Christman was accused of assault on Marge Worster.

- A copy of any dog license applications of Joe Christman, Melissa Christman or Dean Waltz.

- Copies of criminal records of Joseph Christman, Melissa Christman, Dean Waltz, Michael Grissom, and any other witness. I asked that the records include all arrests, regardless of outcome of the case, and all drug and alcohol arrests and convictions.

- Copies of driving records of Joseph Christman, Melissa Christman, and Dean Waltz, including driving records from the states of Wyoming, Alaska, Colorado, and Florida.

- Copies of vehicle registrations for trucks with license plate #'s 15-4729 and 15-4363.

- Copies of phone records for October 11, 2008, showing that Waltz called Christman just before the assault on me. (I had been walking to the Post Office, from 715 Arapahoe to 415 Arapahoe. Christman's truck was not on the street when I walked by on my way to the Post Office. But Waltz saw me and called his son. When I walked back just minutes later, Christman had come to the location – parking his car at an angle that prevented me from reading the license plate – and hid just inside the front door of Las Fuentes. As I walked past, he jumped out, grabbed the mail out of my hand, tried to grab the dog, and called, "Come here Mojo, "obviously intending to steal the dog and take him into the restaurant. Then restaurant personnel would have denied me access. Meanwhile, the dog would have been taken out the back door, where Waltz was waiting in his vehicle.)

County Attorney Williams refused to provide exculpatory information such as copies of police reports and 911 tapes from the previous assaults on me, or the criminal history, domestic violence reports, driving records and arrest records of the alleged "victim" and "witnesses" and he refused to provide a copy of any animal abuse cases on file, dog licenses, or incidents relating

5

to previous impoundments of their dog(s). He also refused to state who the mysterious witness, Kristina McNeff is, or what she would be testifying about.

Rather than provide Discovery and exculpatory evidence, County Attorney dismissed the case **without prejudice** just before the trial. I believe that the Wyoming Statute (which allows a tolling of the 6 month statute of limitations if a case is dismissed by the prosecuting attorney) is unconstitutional. The Sixth Amendment to the United States Constitution gives the accused the right to a speedy trial. It also gives me the right to Discovery, especially disclosure of exculpatory information. The way Wyoming law is currently interpreted, the State can charge an 18-year-old with a crime, dismiss the charges without prejudice, and then prosecute the accused on his 105th birthday. This does not meet the intent of the sixth amendment. I have twice demanded a speedy trial, and the State has ignored me. One of my claims for relief in my lawsuit will be the dismissal **with prejudice** of these false charges. I intend to carry this claim all the way to the United States Supreme Court.

I have found numerous rulings that hold a prosecuting attorney personally liable for prosecutorial misconduct for refusing to provide exculpatory evidence, and some cases where a court has ruled that a prosecuting attorney has qualified immunity, but that the State is liable for his misconduct.

As a result of the Christmans' continual attacks on me, and my heart problems, I had to give the dog away. I had several episodes of tachycardia during and after these assaults, and my life was in danger if I kept the dog. I did not feel safe in Thermopolis, since the Law Enforcement Center would not send help even if I was having a medical emergency. So as soon as I could, I sold my house and moved away, suffering substantial financial losses as a result.

On October 28, 2008, 2 months after I dismissed the case, the Christmans' attorney, Jeff Stanbury, filed motions to reopen the case and a counterclaim for Replevin.

I filed a motion to dismiss their counterclaim on the grounds that included the fact that I no longer owned or possessed the dog. In another pleading filed on the same date, I alleged that the case had been dismissed before the Christmans had filed an Answer or Motion for Summary Judgment. Stanbury claimed the Christman's appearance at a hearing on the restraining order constituted an "oral Answer." I objected, and Walrath stated he would listen to the tape of the hearing and decide. He then ruled that the Christmans had indeed "Answered." (Later, at a different hearing, he admitted that he never bothered to listen to the tape.)

Actually, a Plaintiff has an absolute right to dismiss his case pursuant to Rule 41(a)(1)(i). Once I dismissed the case, the action was a nullity, as if it had never been filed. The Christmans had no ability to reopen it, and they had no standing to file a counterclaim in the first place. Rule 41(a)(1)(i) contains no exceptions that call for the exercise of judicial discretion by any court. This voluntary dismissal is effective immediately on notification or request **even if:**

- The plaintiff files a "Motion to Dismiss" instead of a "Notice of Dismissal." *EOG Resources, Inc. v. State*, 2003 WY 34, 64 P.3d 757; ); *Carter v. United States*, 547 F.2d 528, 529 (5th Cir. 1977.)

- The plaintiff files a *pro se* letter requesting dismissal. *Janssen v. Harris*, 321 F.3d 998 (10th Cir 2003).

6

- The Notice of Dismissal contains a defect, such as the attorney for Plaintiff accidently signing as the attorney for Defendants *American Soccer Co., Inc. v. Score First Enterprises, a Div. of Kevlar Industries*, 187 F.3d 1108, 1109 (9th Cir. 1999), or the plaintiff accidentally refers to Rule 41(A)(2) instead of Rule 41(A)(1). *EOG Resources, Inc. v. State*, 2003 WY 34, 64 P.3d 757; *Williams v. Ezell*, 531 F.2d 1261 (5th Cir 1976.)

- The defendants have already filed a Motion to Dismiss. *McCrary v. Poythress*, 638 F.2d 1308, 1314 (5th cir. 1981.)

- The dismissal was coerced. *Geaney v. Carlson*, 776 F.2d 140, (7th Cir. 1985.)

- The court has held hearings on other matters such as a preliminary injunction. *Aero-Colours Inc. v. Propst*, 833 F.2d 51 (5th Cir. 1987.); *Alphe Spacecom, Inc. v. Zuedong Hu*, 05CA1244, (Colorado Court of Appeals 2007.)

- The court belatedly tries to restyle a defendant's "Motion to Dismiss" as a "Motion for Summary Judgment" after it has lost jurisdiction. *State of Missouri v. Coeur D'Alene Tribe*, (8th cir. 1999.)

- The court has subsequently dismissed the case for failure to prosecute. *Becenti v. Becenti*, Opinion Number 2004-NMCA-091, New Mexico Court of Appeals.

- The defendant made an oral "Answer" during a hearing for a temporary injunction. *Winterland Concessions Co v. Smith*, 706 F.2d 793. (7th Cir. 1983.)

- The defendants have expended a great deal of effort in filing motions and attending hearings, but neglected to file an Answer or Motion for Summary Judgment.); *Janssen v. Harris*, 321 F.3d 998 (10th Cir 2003.); *Carter v. United States*, 547 F.2d 528, 529 (5th Cir. 1977.); *Santiago v. Victim Services Agency*, 753 F.2d 219 (1985); *Granite Springs Retreat Association, Inc. V. Art and Kay Manning*, 2006 WY 60, 133 P.3d 1005.

- The defendant did not receive a notice of dismissal. *Rini v. Rini*, 2002-Ohio 6480; *Becenti v. Becenti*, Opinion Number 2004-NMCA-091, New Mexico Court of Appeals.

If a plaintiff dismisses her case, the court loses all jurisdiction. PERIOD!!!

I could see that Magistrate Walrath was biased, and, since he was a part-time Magistrate, he had no authority to hear the case if I did not give my consent. I requested that he recuse himself, and when he refused, I requested a change of venue. I did NOT give my consent, and it turns out that he had not been appointed by a Circuit Court Judge, as required, but by another part-time temporary magistrate. So he never had authority to hear the case or to make any rulings at all.

To make a long story short, there were a bunch of hearings, during which Magistrate Walrath denied all of my motions and granted almost all of Stanbury's motions, and then set a trial for December 10, 2008. The ruling he made denying my motions was postmarked December 8, 2008, leaving me no time to subpoena witnesses or prepare for trial.

At the trial, Magistrate Walrath told me that I could NOT, under penalty of being put in jail, claim that the dog the Christmans claimed to own was a different dog than the one I had adopted. Actually, it would have been easy to prove. The dog the Christmans claimed to own was an 8½-year-old Labrador Retriever; three different veterinarians identified my dog as a Border Collie

and estimated his age as about 4 years. Their dog allegedly ran away from home on July 20, 2008, but my dog had been impounded by police on July 17, 2008. Their dog was jet black with just a little bit of white; my dog was mostly dark brown and tan with a lot of white. When they submitted a picture of "their" dog at trial, I tried to state that that was not the same dog, but Magistrate Walrath would not let me say so and called me to the bench and again warned me that I would go to jail if I even hinted that there were two different dogs. Joseph Christman had accosted another senior citizen who was walking a much smaller dog and tried to claim that dog as his own. (He didn't even recognize "his" dog.) At the time of the October 11, 2008, assault on me, Dean Waltz claimed that HE was the owner of the dog, but Magistrate Walrath refused to let in any evidence or testimony about that assault on me or Waltz's statement. Obviously, if Dean Waltz also claimed ownership of the dog, the Christmans had NO claim for Replevin, as a claim for Replevin requires that the claimant(s) have an exclusive right to the property.

There were many other reasons I was sure they never owned the dog, but one sure way to tell that the dog never belonged to them was that he refused to go to them when they called him. They are much bigger, stronger, and younger than I am; the only reason they were not able to steal him from me on the many occasions they tried was that he refused to go with them.[2]

Louis Walrath illegally presided over the Kangaroo Court. One of the jurors was a close friend of the Christmans, but lied under *voir dire*. Dean Waltz showed up at the beginning of the trial and made sure that all the jurors knew that he knew who they were. Since Waltz has a reputation as the meanest man west of the Mississippi, the jurors were afraid to find for anyone but the Christmans. The jury instructions were ridiculous. Instead of Replevin instructions, they were told that if I had not proved that the Christmans never owned the dog, they must find for the Christmans. They were also given a bunch of alternate ways that the jury "must" find for the defendants, such as if the police were negligent. (And three different police officers, including Chief Nelson, took the stand and swore under oath that the police department was negligent!)

At the December 10th trial, the defendants' attorney, Jeff Stanbury, introduced some police reports as evidence. These were some of the same police reports that Chief Nelson had been refusing to provide to me, even though the criminal trial was still scheduled. While he was under oath, I asked him why he provided the reports to the defendants when he had refused to provide them to me. He admitted under oath that his refusal was in retaliation because I exercised my first amendment right and filed a grievance with the Town. When I read the report of the September 1, 2008 assault on me, I found out for the first time why no police officer came to my aid. At about 5:35 a.m., I had reported that Christman was driving his "black or dark-colored" pick-up truck, license #15-4363. Bill Gordon did nothing to help me during the whole time I was trying to escape. At 6:06 a.m. I called him back and told him, "Never mind, I am home." At 6:11 a.m. Bill Gordon contacted Deputy Kraushaar and asked him to go to Christman's home at 121 Warren and look for a white pick-up truck, license 15-4729. **Instead of helping me, Bill Gordon did nothing until he found out I had escaped; then he sent Officer Kraushaar to the wrong address to look for the wrong vehicle.** Officer Kraushaar found the white pick-up and felt the engine to see if it was warm, – which, of course it wasn't warm because Christman

---

[2] Once, when I left town to look for another place to live, I had to leave the dog with a veterinarian. When I returned 3 days later, the vet assistant was just taking the dog for a walk. I opened my car door and got out. As soon as he saw me, the dog broke away from the vet assistant and jumped into my car. That vet assistant was half my age and 100 times stronger, but she couldn't keep the dog from jumping into my car.

8

had been driving a <u>different</u> truck. Then Officer Kraushaar coded the report as unfounded. I objected to the admission of the police report because I saw it had my personal information on it, such as my full name, address, telephone number, date of birth, and Social Security number, but Magistrate Walrath admitted it. So now the jury had this information and it is public record, as well.

On February 26, 2009, Judge Waters granted a new trial. Judge Waters ruled that, pursuant to W.S. §5-9-212(b), the appointment of a part-time magistrate to a case must be made by a judge, not another part-time magistrate. He had been on the verge of dismissing the case entirely, but, while he was speaking, Joseph Christman began arguing with him. I didn't hear what he said because there were two attorneys between him and me, but it made Judge Waters mad. Judge Waters told him to be quiet or he would call the sheriff and have you (Joe Christman) put in jail for contempt of court.

At that, Melissa Christman became incensed, and grabbed her little boy and stalked out of the courtroom. (I forget exactly what she said.) Anyway, Joe Christman hesitated a second or two, and then followed her. As he reached the door, he hollered to Judge Waters, "You're the scum of the earth."

For some reason, after being insulted, Judge Waters apologized to the Christmans (actually to their attorney, since the Christmans had left.) Then he changed his mind, and instead of dismissing the case, he ordered a new trial. He didn't set a new trial date, though.

About a month and a half later, the Christmans filed a Notice of Appeal. The Notice was deficient in several respects, and the defendants never did get around to filing an appeal brief. Their attorney, Jeff Stanbury, resigned from the case a couple of months later. Now Judge Skar has scheduled a telephone hearing for August 3, 2009. I have no idea why Judge Skar thinks there should be a hearing, since the Christmans never filed their appeal brief.

## DAMAGES

The worst emotional damages were from the false criminal charges. It wasn't just the possible conviction (with a possible fine and 6 month jail sentence) but the no-contact order that I couldn't possibly obey, the likelihood that I would be jailed for coming in contact with people I couldn't recognize if I saw them, the possible filing of new false accusations against me – possibly felony charges next time. I was a prisoner in my own home. But even then I couldn't be sure they wouldn't file more false charges. After all, I lived alone and didn't ever have an alibi.

Even though the criminal charges were eventually dropped, I still spent nearly 3 months under a cloud.[3] All the time I was worried that my employer might find out about the charges and let me go. I had been working part time for the United States Bureau of the Census. I had to pass a thorough background check before getting the job. Since my job involved going into people's homes and getting them to respond to survey questions, the Census Bureau wouldn't want to have someone who assaults people doing that job. I was restricted as to where I could go and

---

[3] And am still under a cloud, since the case was dismissed <u>without</u> prejudice.

9

what weapons I could own. There was always a chance that my caseload would take me to a location where I was restricted from going.

The *Independent Record* didn't initially contact me for my side of the story and only reported the Christmans' false statements. Even after I contacted the paper and complained, they still did a very poor job of stating my side. The newspaper reported several times – sometimes with a front-page lead, other times on the back page – that I had been charged with assault and battery. When the paper finally reported that the charges had been dropped, that statement was buried in the middle of the paper and followed by a sentence that said the charges could be re-filed.

Because of all of the threats and harassment, and especially because of the criminal charges, I had no choice but to get rid of the dog, sell my house and move. Moving is a very hard job for a single woman who has a bad heart and lives alone. Packing was torture. I had to just pack one box or maybe half a box, and then rest. Then I wasn't strong enough to move the box; it just stayed in the middle of the room. Worse, I left my whole life behind. I left my home, my neighbors, my friends. When I moved I lost my address, telephone number, email address, bank, safe deposit box, post office box, doctor, dentist, ophthalmologist, veterinarian, plumber, electrician, lawn care, and cemetery plot.[4] I have had to memorize different cable tv numbers, phone numbers, and radio station numbers.

I lost the income from the little house out back. Suppose I lived another 20 years. At 350/month, that is $84,000.00 in lost income.

I am also losing Census Bureau income. I will lose about $1,000.00/month. Let's assume that I would have gone on working for another 5 years. That is another $60,000.00 in lost income.

I sold my home for $5,250.00 less than my asking price to the first person who made an offer. My closing costs to sell the new house, including buyer incentives, were $14,750.83. I gave another $1,697.40 to the moving company. This does not include some packing materials, the closing costs on the new place, gas to look for a new residence, motel room for 2 weeks, storage locker, etc. And it does not include fees for setting up utilities, costs of buying new items for the new residence,[5] and items lost or broken during the move. Before she died, my aunt moved a lot and she always used to say, "Three moves are as good as a fire." I lost a home-made loom that my old neighbor had given me as a gift. It was too big to fit in a box, and then got forgotten by the movers. I lost a gift my grandson had given me. I lost pictures and books. Some items were discarded as being not worth moving.

I had to sign a two-year contract to get a cell phone. That's $39.09 times 24 months plus a $35.00 set up fee, or $973.16.

---

[4] Since my last will and testament specifies that I be buried in that cemetery plot in Thermopolis, I will have to hire an attorney to draw up a new will.

[5] For instance, my old curtains didn't fit; my old dining kitchen table was too big; the washer and dryer were sold with the old house and the new residence didn't have them.; the stove at the new residence had to be replaced; I needed to buy a can opener, paper towel holder, etc. (My old can opener was permanently attached to the kitchen wall.)

I have $3713.74 in attorney fees so far, plus the $50.00 jury fee for the jury trial that Louis Walrath had no authority to preside over.

The penalty for violation of the Drivers Privacy Protection Act, 18 U.S.C §2721 *et. seq.* for disclosing my personal information is $2,500.00 liquidated damages or actual damages, whichever is greater PLUS attorney's fees.

The police illegally confiscated items that were not returned by the county attorney after he dismissed the case cost $77.47. Later I bought a used hand gun for $157.50.

My dental bills for the tooth I chipped when Melissa Christman nearly ran over me were $190.00. Although I am on Medicare, I had a couple of regular doctor's visits at $10.00 each.

I spent countless tankfulls of gas driving to Shoshoni or Worland twice per day just to walk my dog. And that was when gas was running around $4.00/gallon. Then I had to make a few trips to Colorado. And I have had to spend gas to return to Thermopolis for court hearings, etc.

It is my understanding that under §1-39-118 of the governmental claims act, I am limited to **$250,000.00 per entity per claim**. I believe there were multiple transactions or occurrences. Below are a few:

I. Violation of my civil rights under the Fourteenth Amendment of the United States Constitution to equal protection of the law – against the Town of Thermopolis and the Law Enforcement Center. The Law Enforcement Center is run jointly by the Town of Thermopolis Police Department and the Hot Springs County Sheriff's Office.

II. Violation of my civil rights under the First Amendment of the United States Constitution to petition the government – against the Town of Thermopolis, Chief Mark Nelson, and Officer Bill Gordon.

III. Violation of my civil rights under the Fourth Amendment of the United States Constitution to protection from illegal search and seizure – against Officer Jeff Brown, the Town of Thermopolis and the Law Enforcement Center.

IV. Violation of my civil rights under the Sixth Amendment of the United States Constitution to due process, knowledge of the evidence against me, and speedy trial – against the Town of Thermopolis, the Law Enforcement Center, Chief Nelson, Jerry Williams, and the State of Wyoming.

V. Malicious prosecution and filing false police reports – against the Town of Thermopolis, the Law Enforcement Center, the State of Wyoming, Joseph Christman, Kristina Mc Neff, Dean Waltz, and Las Fuentes Restaurant.

VI. Prosecutorial misconduct against Jerry Williams.

VII. Tortious conduct of peace officers against the Town of Thermopolis, the Law Enforcement Center, Officer Jeff Brown, and Officer Bill Gordon.

VIII.   Breach of Contract against the Town of Thermopolis.

IX.   Negligence against the Law Enforcement Center. On December 10, 2008, three police officers admitted under oath that the Law Enforcement Center was negligent.

X.   Abuse of Process: Failure of the State of Wyoming to supervise the clerks and magistrates of the Circuit Court between the time the Circuit Court judge was promoted to the District Court and the time a new Circuit Court judge was appointed. (Essentially allowing the inmates to run the asylum.) While he was an employee of the Town of Thermopolis, part-time magistrate Thomas Harrington insinuated himself into a case in which the Town should have been a necessary party and, among other things, gave the defendants permission to ignore court rules and file a verbal Answer and Counterclaim. Then, without authority to do so, he appointed another part-time magistrate to hear the case. After a day long trial, and motions by the defendants to hold me in contempt of court (which cost me over $3,000.00 so far to defend), the verdict was vacated and we may have to start all over again.

XI.   Abuse of Process against Joseph and Melissa Christman and their attorneys for filing a frivolous lawsuit when they didn't have standing to sue pursuant to W.S. §11-31-211.

XII.   Invasion of Privacy against the Law Enforcement Center for putting my personal information on a police report given to the person who had been stalking and attacking me. This is particularly egregious as Joseph Christman has apparently already stolen someone else's identity. Although he goes by the name of Joseph H. Christman, his father is named Waltz. That could be explained, except that there is ANOTHER Joseph H. Christman who is using the same date of birth and Social Security number. The Wyoming Joseph H. Christman testified under oath that he had lived in Alaska until November 2006, and that he then moved to Wyoming. But there is ANOTHER Joseph H. Christman, Social Security Number ███████ date of birth ███████, who obtained an identification card (█████████) from the State of Colorado on October 9, 2007 – almost a year after he claims he moved to Wyoming. That other Joseph Hayden Christman turned in a license (██████████) from the State of Florida to obtain his Colorado ID.

XIII.   Violation of the Drivers Privacy Protection Act, 18 U.S.C §2721 et. seq. against the State of Wyoming for disclosing my personal information. (This violation of Public Law 103-322 carries penalties of the greater of $2,500.00 liquidated damages or actual damages, PLUS attorney's fees and costs and has been upheld by the United States Supreme Court.)

XIV.   Invasion of Privacy against the State of Wyoming, Louis Walrath, White & White PC, and Jeff D. Stanbury for allowing a police report with my personal information to be admitted into evidence and thus made public record.

XV.   Conspiracy against the Town of Thermopolis, the Law Enforcement Center, Thomas Harrington, Michael Messenger, Joseph Christman, Officer Bill Gordon, and ?????for attempted violation of my rights under the Fourth Amendment of the United States

Constitution to protection from illegal search and seizure. (See *Price-Cornelison v. Brooks*, 524 F.3d 1103, 10th Cir. 2008.) The main difference between my case and Price-Cornelison is that in Price Cornelison, the plaintiff was denied police protection when someone tried to steal her property and warned by the peace officers that if she tried to protect her property herself, she would be arrested. In my case, I was able to stop the theft of my property, but the co-conspirators (the police) charged me with a crime for doing so. In both cases, law enforcement was an accomplice to the theft or attempted theft. The Tenth Circuit ruled that the plaintiff had a claim for illegal search and seizure against the officers. In this case the Court denied qualified immunity.

XVI. Assault and Battery, Attempted Larceny, and filing false police reports against Joseph Christman, Dean Waltz, and Las Fuentes Restaurant.

XVII. False Imprisonment against Joseph Christman, Melissa Christman and Dean Waltz.

XVIII. Vehicular Assault against whoever owns the white pick-up truck, license #15-4729, that nearly ran me down on August 26, 2008 and caused me to chip my tooth. (That truck and the other truck they sometimes drive, license 15-4363. I think they both belong to Dean Waltz.)

XIX. Malpractice against White & White PC and Jeff D. Stanbury.

XX. Abuse of Authority, incompetence and violation of W.S. §5-9-212 against Thomas Harrington and Louis Walrath.

The damages I am claiming at this time do not include pain and suffering, damage to my physical and mental health, damage to my reputation, the decline in my quality of life, additional attorneys fees to pursue this new lawsuit in Federal Court, etc. And I have not yet computed the total costs in gasoline, paper, ink, postage, the new computer I had to buy when my old computer died just before the Christmans filed their frivolous appeal, and many other damages that I will claim if it becomes necessary to file a lawsuit.

I do not think that the Wyoming Governmental Claims Act applies to my Federal Claims, but even if it does, I count 10 claims against the Town ($2,500,000.00), 8 claims against the County ($2,000,000.00), and 5 claims against the State ($1,250,000.00), for a total of $5,750,000.00.

These damages are quite small, however, compared to the potential liability the State of Wyoming has for violating the Drivers Privacy Protection Act. Since the State of Wyoming disclosed not only my personal information, including my Social Security Number, but also disclosed Joseph Christman's Social Security number, it seems apparent that the State of Wyoming has a policy or practice of regularly disclosing the Social Security numbers of all of its Citizens. Once my lawsuit is made public, the State will likely be defending numerous lawsuits by other citizens, incurring AT LEAST $2,500.00 plus attorney's fees for each citizen who wishes to file a claim. Attorney's fees in Federal Court can easily exceed $100,000.00 PER CLAIMANT. In this economic climate, probably a large number of citizens will want to file a claim, and I am sure there are many attorneys who would like to take a case that is a sure-fire win. Section 2724 provides for a civil cause of action: "A person who knowingly obtains,

13

discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court." 18 U.S.C. §2724(a).

But the State of Wyoming faces a much costlier liability even than that, because under 18 U.S.C. § 2721(b), State departments of motor vehicles with a "policy or practice of substantial noncompliance" with the Act's provisions are subject to a civil penalty of up to $5,000 a day for each day of substantial noncompliance, to be imposed by the United States Attorney General. 18 U.S.C. § 2723(b). This means that the State of Wyoming could be subject to more than $1.8 Billion for each year that the state has been violating the Drivers Privacy Protection Act. I am sure the Federal Government could use the money.

Persons who knowingly violate the Act are also subject to criminal fines. 18 U.S.C. § 2723(a).

One more thing: I found the minutes of the County Commissioners for March 3, 2009 on the Internet. Those minutes contained a paragraph about "Joe and Missy Christman" requesting that the County compensate them for their legal fees. The Commissioners informed the Christmans that they do not have any authority over the Circuit Court, and referred them to Thomas Harrington for advice (the same Thomas Harrington that they had conspired with from the beginning.)

The same date, however, the Commissioners appointed six part-time magistrates to serve on the Circuit Court. Those part-time magistrates included the incompetent previous part-time magistrates, Thomas Harrington and Louis Walrath. If the County appoints the part-time magistrates to the Circuit Court, then it seems to me that they have some liability for their actions.

It appears that the Commissioners were advising the Christmans to pursue their claim against the State of Wyoming. If the Christmans pursued their claim against the State of Wyoming, and the State paid their attorney fees, then the State must do the same for my attorney fees, otherwise, my 14th Amendment claim is proven. Notice that the reverse is not the case. The State is liable to me for allowing the case to be reopened and causing me to defend against the case after two different State employees allowed it to continue. The Court had no jurisdiction and these two "magistrates" had no authority even if there had been jurisdiction. On the other hand, the case had already been dismissed when the Christmans, who had no standing to sue, improperly reopened it. All of their attorney fees occurred <u>after</u> I had dismissed my case. If Louis Walrath had been honest and competent, he would have refused to allow them to reopen the case, and they would have incurred few or no attorney fees. If anyone has liability to the Christmans, it is their attorney, who gave them bad advice, or perhaps against Thomas Harrington, who initially gave them the bad advice that they didn't need to file an Answer.

14

## MEDICAL CONDITIONS

**Prosopagnosia** (sometimes known as **face blindness**) is a disorder of face perception where the ability to recognize faces is impaired, while the ability to recognize other objects may be relatively intact. The term usually refers to a condition following acute brain damage. The specific brain area usually associated with prosopagnosia is the fusiform gyrus. I suffered a brain injury in the late 1990's and have had difficulty recognizing faces ever since. In fact, I don't even recognize myself. If I am in a shopping center or someplace where there are mirrors, and unexpectedly see my reflection, my first reaction is to look around to see who is standing near me.

**Osteoporosis** is a disease of bone that leads to an increased risk of fracture. In the past decade I have had two broken bones fingers and have broken my left foot several times. Putting pressure on my foot by running causes a risk of a new fracture. Falls are dangerous for senior citizens. Fully ¼ of seniors who suffer a broken pelvis wind up losing independence, mobility, or even die from complications of the fracture.

**Supraventricular tachycardia (SVT)** is a rapid rhythm of the heart in which the origin of the electrical signal is either the atria or the AV node. The heart beats up to 240 beats per minute. At that rate, the heart doesn't have time to fill up with blood between beats and so the heart just sort of quivers, and not enough blood gets pumped to the brain. During this time the patient may feel dizzy, confused, or pass out. Although it is usually not fatal, it can result in a heart attack. Not all causes are known, but it can be brought on by stress or too much caffeine.

**Post-polio syndrome (PPS)** is a condition that affects approximately 25–50% of people who have previously contracted poliomyelitis—a viral infection of the nervous system—after recovery from the initial paralytic attack. Typically the symptoms appear up to 40 years after the original infection.

I had polio when I was 18 months old and began noticing symptoms of PPS when I was in my early 40's. I have suffered severe scoliosis all my life, which was caused by the fact that the disease left the muscles on the right side of my body weaker than those on the left side.

After a period of prolonged stability individuals who had been infected and recovered from polio begin to experience new signs and symptoms, characterized by muscular atrophy (decreased muscle mass), weakness, pain and fatigue in limbs that were originally affected or in limbs that didn't seem to have been affected at the time of the initial polio illness. PPS is a very slowly progressing condition marked by periods of stability followed by new declines in the ability to carry out usual daily activities. Most patients become aware of their decreased capacity to carry out daily routines due to significant changes in mobility, decreasing upper limb function and lung capability. Fatigue is often the most disabling symptom; even slight exertion often produces disabling fatigue and can also intensify other symptoms. Problems breathing or swallowing, sleep-related breathing disorders, such as sleep apnea and decreased tolerance for cold temperatures are other notable symptoms. Although it is not usually listed as a symptom, I also suffer from problems maintaining my balance.

The most widely accepted theory of the mechanism behind the disorder is "neural fatigue". A motor unit is a nerve cell (or neuron) and the muscle fibers it activates. Poliovirus attacks specific neurons in the brainstem and the anterior horn cells of the spinal cord, generally resulting in the death of a substantial fraction of the motor neurons controlling skeletal muscles. In an effort to compensate for the loss of these neurons, surviving motor neurons sprout new nerve terminals to the orphaned muscle fibers. The result is some recovery of movement and the development of enlarged motor units. The enlargement motor neuron fibres places added metabolic stress on the nerve cell body to nourish the additional fibers. After years of use, this stress may be more than the neuron can handle, leading to the gradual deterioration of the sprouted fibers and, eventually, the neuron itself. This causes muscle weakness and paralysis. Restoration of nerve function may occur in some fibers a second time, but eventually nerve terminals malfunction and permanent weakness occurs. When these neurons no longer carry on sprouting, fatigue occurs due to the increasing metabolic demand of the nervous system. The normal aging process also may play a role. With age, most people experience a decrease in the number of spinal motor neurons. Because polio survivors have already have lost a considerable number of motor neurons, further age-related loss of neurons may contribute substantially to new muscle weakness. The overuse and underuse of muscles also may contribute to muscle weakness.